[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 3, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-13049
Non-Argument Calendar

_____

Agency Nos. A77-873-874 and
A77-873-875

ANDRES ARBOLEDA,
ANA MARIA POSADA,
ANA MARIA ARBOLEDA,
PABLO ARBOLEDA,
SANTIAGO ARBOLEDA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(January 3, 2006)

Before TJOFLAT, DUBINA and BARKETT, Circuit Judges,

PER CURIAM

Andres Arboleda, along with his wife, Ana Maria Posada, and their children, Ana Maria Arboleda, Pablo Arboleda, and Santiago Arboleda ("the petitioners"), petition us for review of the Board of Immigration Appeals's ("BIA's") final order, dismissing their appeal of the Immigration Judge's ("IJ's") denial of asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 18 U.S.C. § 1101-1537, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c).

The BIA found that, even assuming Arboleda's testimony that he was persecuted by the Revolutionary Armed Forces of Columbia ("FARC") because of his work with the Conservative Party was credible, and assuming that he suffered past persecution, Arboleda failed to establish his eligibility for relief because the documentary evidence showed that the "FARC does not function countrywide and, therefore, it is reasonable for the petitioners to relocate internally." BIA Order, Administrative Record ("A.R.") at 3. On appeal, the petitioners argue that substantial evidence did not support the BIA's determination that the FARC did not function countrywide in Colombia. In support of this argument, the petitioners rely on the 2000 State Department Country Report on Colombia, which states that: (1) the Colombian government faces serious challenges to its control over the

national territory; (2) the major guerrilla groups in Colombia, the FARC and National Liberation Army ("ELN"), of which the FARC is the largest, consisted of an estimated 11,000 to 17,000 full-time combatants; (3) the guerrilla groups exercised a "significant degree of territorial influence and initiated armed action in nearly 1,000 of the country's 1,085 municipalities during the year"; and (4) the FARC regularly attacked civilians in virtually every region of Colombia. The petitioners point out that we are aware of the widespread presence of the FARC in Colombia, since, in Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 n.7 (11th Cir. 2005), we found that the evidence in the 1999 and 2000 Country Reports did not support a finding that relocation to an area where the ELN was nonexistent or minimal was viable.

We review only the BIA's decision in this case, as it did not expressly adopt the IJ's findings below. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). We review the determination by the BIA that an alien is statutorily ineligible for asylum or withholding of removal under the "substantial evidence test." Id. at 1283. We "must affirm the BIA's decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Id. at 1283-84 (quoting Lorisme v. INS, 129 F.3d 1441, 1444-45 (11th Cir. 1997)). We may not reweigh the evidence and may not reverse the BIA's

3

findings of fact unless the record compels a contrary conclusion.  Farquharson v. United States Att'y Gen., 246 F.3d 1317, 1320 (11th Cir. 2001).

The Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee."  INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).  A "refugee" is defined as:

> any person who is outside any country of such person's nationality . . . ,  and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A).  To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause such future persecution.  Al Najjar, 257 F.3d at 1287; 8 C.F.R. § 208.13(a), (b).  "A showing of past persecution creates a presumption of a 'well-founded fear' subject to rebuttal by the [Immigration and Naturalization Service ("INS")]."  Sepulveda, 401 F.3d at 1231; 8 C.F.R. § 208.13(b)(1).  "[T]he INS can overcome the presumption of future persecution by showing that [the applicant] could avoid future threats by relocating within the country, assuming that it is reasonable under all the circumstances to do so."  Antipova v. United States Att'y Gen., 392 F.3d 1259, 1265 (11th Cir. 2004)

4

(withholding of removal); 8 C.F.R. § 208.16(b)(1)(i)(B).

The BIA has construed the INA and its regulations to require that an asylum applicant show that he faces a threat of future persecution country-wide. Matter of Acosta, 19 I. & N. Dec. 211, 235 (BIA 1985). We have upheld the imposition of a "country-wide" requirement, and have noted that "it is not unreasonable to require a refugee who has an internal resettlement alternative in his own country to . . . establish that such an option is unavailable." Mazariegos v. United States Attorney Gen., 241 F.3d 1320, 1327 (11th Cir. 2001). Since 2001, the immigration regulations have codified the country-wide requirement, and have instructed the IJ to consider whether "under all the circumstances it would be reasonable to expect the applicant [to relocate]." 8 CFR § 1208.13(b)(2)(ii); see also 8 CFR § 1208.13(b)(1)(i)(B).[1] The regulations identify several considerations relevant to the "reasonableness" determination, including

> whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country, administrative, economic or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.

---

[1]Although Mazariegos was issued on February 12, 2001, after the regulation's effective date (January 5, 2001), see 65 Fed.Reg. 76133, it appears that the panel did not consider the regulation. See Mazariegos, 241 F.3d at 1325 ("The [INA] does not expressly require that asylum seekers face a threat of persecution throughout their entire country of origin as opposed to a particular place within that country. Nor do the INS's regulations express such a requirement.").

8 CFR § 1208.13(b)(3).  See, e.g., Sepulveda, 401 F.3d at 1232 n.7 (considering, inter alia, the large numbers of internally displaced people  – and the resulting lack of access to health care, education, or employment – in concluding that relocation within Colombia was not reasonable).  See also Da Silva v. Ashcroft, 394 F.3d 1, 8 (1st Cir. 2005) ("The touchstone is whether, under all the circumstances of a particular case, internal relocation is a reasonable solution.");  Mohamed v. Ashcroft, 396 F.3d 999, 1006 (8th Cir. 2005) ("Relocation must not only be possible, it must also be reasonable.");  Gambashidze v. Ashcroft, 381 F.3d 187, 192  (3d Cir. 2004) ("Thus the regulation envisions a two-part inquiry: whether relocation would be successful and whether it would be reasonable.");  Eduard v. Ashcroft, 379 F.3d 182, 194 (5th Cir. 2004) (reversing and remanding to BIA for the requisite determination of whether relocation was "reasonable").

In the instant case, as the government concedes, the BIA presumed past persecution and therefore the burden was on the government to show that internal relocation was reasonable.  See BIA's Order at 1-2; Respondent's Brief at 19; 8 C.F.R. §1208.13 (b)(1)(ii).  The only evidence submitted by the Department of Homeland Security ("DHS," formerly the INS) to satisfy its burden was (1) the 1997 Department of State Asylum Profile, and (2) the 1999 and 2000 Department of State Country Reports.  See INS Notices of Filing Documents, A.R. at 99 &

6

421. This evidence alone is insufficient to meet the government's burden.

On the contrary, the record in this case compels the conclusion that the FARC operates country-wide in Colombia, and that relocation was therefore not a viable option for the petitioners to escape persecution. On this point, Sepulveda is instructive. In that case, we ultimately held that the petitioner had failed to establish a well-founded fear of persecution, but we explicitly addressed the petitioner's claim that substantial evidence did not support the IJ's finding that she could internally locate to an area within Colombia where the ELN presence was nonexistent or minimal, stating:

> [T]he evidence does not support such a finding. The 1999 and 2000 Country Reports, on which the IJ ostensibly relied, make clear that the guerrillas exercise influence throughout Colombia, and that small and large municipalities are already overwhelmed by the huge populations of displaced persons, who are consequently without access to health care, education, or employment.

Sepulveda, 401 F.3d at 1232 n.7.

Looking at the same country reports at issue in Sepulveda (i.e., 1999 and 2000 Department of State Country Reports on Colombia) we again conclude, as we did in that case, that these do not support a finding that the guerillas did not exercise influence throughout Colombia.[2] According to the 2000 Country Report,

---

[2] The fact that Sepulveda's persecutors were the ELN guerrillas, not the FARC guerillas, only further supports our analysis. It is undisputed that the FARC is the largest and most widespread of any guerrilla group in Colombia.

7

the guerillas "exercised a significant degree of territorial influence and initiated armed action in nearly 1,000 out of the 1,085 municipalities [approximately 92%] during the year, which was approximately the same level as in 1999." See A.R. at 100; see also A.R. at 423 (1999 Report). The 2000 Report states that the two major guerilla groups, of which the FARC is the largest, consist of an estimated 11,000 to 17,000 full-time combatants organized into more than 100 semi-autonomous groups. It says that "FARC and the ELN regularly attacked civilian populations, committed massacres and summary executions and killed medical and religious personnel." A.R. at 102. The 2000 report indicates that the FARC continued its practice of using gas canisters and mortars to destroy small towns, and the guerrillas held more than 1,000 kidnapped civilians and 500 kidnapped soldiers and police. Id. The report documents that "[i]n many places, guerillas collected 'war taxes,' forced members of the citizenry into their ranks, forced small farmers to grow illicit crops, and regulated travel, commerce and other activities." Id. In fact, according to the report, the FARC announced "Law 002" in March of 2000, which "demanded that anyone with assets of $1 million pay taxes to the FARC or risk kidnapping." Id. In sum, the 2000 Country Report illustrates the killing, kidnapping and other atrocities commited by the FARC against the civilian population in virtually every region in Colombia, which it states caused an

8

estimated 1 million displaced citizens from 1996 to 2000. See A.R. at 101, 108-12, 118-21.[3]

The only other evidence submitted by the government to satisfy its burden of showing that relocation would be a successful way for the petitioners to avoid persecution is the 1997 Department of State Asylum Profile. The 1997 profile opines that "those fleeing guerilla or police/military harassment or threats in conflictive zones usually are able to find peaceful residence elsewhere in the country." A.R. at 142. The profile states that relocation is available because the guerrilla movement was "fragmented" and only operated in "specific areas of the country." Id. at 142-43. It reports that, in 1997, the guerillas exercised influence in only about half of the country's municipalities. Id. at 137.

_____

[3]The 1999 Country Report paints a very similar picture. See A.R. at 423 ("The Government continued to face a serious challenge to its control over the national territory, as longstanding and widespread internal armed conflict and rampant violence – both political and criminal – persisted"); id. "The two major guerrilla groups, the [FARC] and the [ELN], consist of an estimated 11,000 to 17,000 full-time combatants organized into more than 100 semiautonomous groups. The FARC and the ELN, along with other smaller groups, exercised a significant degree of influence and initiated armed action in nearly 1,000 of the country's 1,085 municipalities during the year, compared with 700 municipalities in 1998"); id. at 422-23 ("Paramilitary groups and guerrillas were responsible for the vast majority of political and extrajudicial killings during the year. . . . The FARC and the ELN regularly attacked civilian populations, committed massacres and summary executions, and killed medical and religious personnel. Guerillas . . .were responsible for the majority of kidnapings. Guerillas held more than 1,000 kidnaped civilians, with ransom payments serving as an important source of revenue. Other kidnap victims were killed. In some places, guerillas collected 'war taxes,' forced members of the citizenry into their ranks, forced small farmers to sow illicit crops, and regulated travel, commerce, and other activities"); id. at 424 ("Violence and instability in rural areas displaced approximately 288,000 civilians from their homes during the year. The total number of internally displaced citizens during 1995-99 probably exceeded 1 million").

9

While the 1997 Asylum Profile's assessment would appear to support the government's claim, it is contradicted by the more recent 1999 and 2000 Country Reports. The 2000 Country Report documents the guerillas' territorial influence in the year 2000 at 92% of the countries' municipalities – a dramatic increase of more than 40% since 1997. The Country Reports no longer speak of the guerrillas as "fragmented" and limited in operations to only specific areas of the country. Rather, they attest to an intensification of the conflict and a territorial expansion in guerrilla violence throughout the country.

The remainder of the record evidence – presented by the petitioners – further compels the conclusion that the FARC operated country-wide. The petitioners submitted documentary evidence from the U.S. Department of State, Amnesty International and reputable news agencies that attests to the widespread nature of FARC atrocities committed throughout the entire country. This evidence showed that: (1) the activities of guerrilla groups in Colombia, with membership in the tens of thousands, of which the FARC is the largest, best trained and best equipped, were "widespread," at least in rural areas; (2) the FARC has 15,000 to 17,000 combatants and controlled an estimated 40% of the countryside; (3) the FARC "regularly" attacked civilian populations, laid landmines, kidnapped civilians, and destroyed small towns; (4) at least 300,000 people were displaced to urban areas in

10

1999 due to guerrilla violence; and (4) in 2000, the FARC had the power and influence to pass a law demanding war taxes from Colombian citizens. See A.R. at 580-81, 590, 594, 600, 615, 631, 653.

Finally, Arboleda's past experience supports the conclusion that relocation would not successfully shield him of persecution by the FARC. Arboleda testified that he relocated from his farm in Armero Guayabal (in the department of Tolima) to the capital city, Bogota, after he was detained by the FARC while driving in his car in Amero Guayabal. Despite his relocation, the FARC continued to threaten him and his family at both his Bogota home and office, with frequent notes and telephone calls detailing the family's activities and threatening them with death. At the same time, the FARC continued to persecute Arboleda at his farm, by burning down his farm house and killing several of his cattle. See A.R. at 375-81. In fact, according to Arboleda's testimony, even after the family left Colombia for the United States, the FARC continued to go after him by placing bombs in two of his Bogota restaurants and by sending a sympathy card (i.e., an implicit death threat) to his home in Bogota.

Given our consideration of the evidence, we are compelled to find that the INS failed to establish by a preponderance of the evidence that the petitioners could relocate within Colombia out of the FARC's reach. See 8 CFR §

11

1208.13(b)(1)(ii) (burden of proof).   Moreover, even if the BIA's conclusion that the FARC did not function country-wide had been supported by substantial evidence, the BIA erred in failing to consider whether relocation for the Arboledas was "reasonable."  The BIA found that:

> [t]he documentary evidence submitted by [the DHS] reflects that the [FARC] does not function countrywide, and therefore, it is reasonable for the respondents to internally relocate.

A.R. at 3.  This analysis is incomplete.  As stated earlier in our opinion, the agency regulations require that the factfinder consider the following factors in its reasonableness determination, including

> whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country, administrative, economic or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.

8 CFR § 1208.13(b)(3).  Thus, in Sepulveda we considered not only the fact that the guerillas exercised influence throughout the country, but also that the numbers of internally displaced people due to the civil war and the violence and the resulting scarcity of health care, education, and employment would make it unreasonable for the petitioners to relocate.  See id, 401 F.3d at 1232 n.7.  The BIA in this case, however, did not mention any of the other factors it should have considered in making its determination.  This is reversible error.  See Hagi-Salad v.

Ashcroft, 359 F.3d 1044, 1045 (8th Cir. 2004) (remanding to the BIA for a reasonableness determination based on factors in 8 CFR § 208.13(b)(3)); Knezevic v. Ashcroft, 367 F.3d 1206, 1214-15 (9th Cir. 2004) (same). See also Gambashidze v. Ashcroft, 381 F.3d at 192 ("Thus the regulation envisions a two-part inquiry: whether relocation would be successful, and whether it would be reasonable").

Accordingly, we conclude that the BIA's finding that the DHS met its burden in establishing that the petitioners could reasonably relocate within Colombia to escape persecution was not supported by substantial evidence in the record. The evidence in the record compels a finding that the FARC operates country-wide in Colombia, and the BIA failed to independently consider whether it was possible for the Arboledas to find a safe haven through internal relocation. Because the BIA affirmed the IJ's removal order on this ground alone, we vacate the BIA's order and remand this case back to the BIA for further proceedings not inconsistent with this opinion.

PETITION GRANTED.