[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-13592
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 6, 2006
THOMAS K. KAHN
CLERK

BIA Nos.
A95-905-405
A95-905-406

LIFAITE BARDETTE,
MAXIME ALPHONSE BARDETTE,
GETHRO BARDETTE,
NAAMA BARDETTE,
NEHEMIE BARDETTE,
JEMIMA BARDETTE,
NAOMIE BARDETTE,
HADASSA BARDETTE,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

(March 6, 2006)

Before BLACK, BARKETT  and FAY, Circuit Judges.

PER CURIAM:

Lead petitioner, Lifaite Bardette, her husband, Maxime Alphonse, and their children, Gethro, Naama, Nehemie, Jemima, Naomie, and Hadassa, through counsel, petition for review of the Board of Immigration Appeals' ("BIA's") order, summarily affirming the immigration judge's ("IJ's") decision denying their applications for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), INA §§ 208, 241, 8 U.S.C. §§ 1158, 1231.[1]  The petitioners argue that the IJ's determination that they failed to establish statutory eligibility for this relief from removal was not supported by substantial evidence. For the reasons set forth more fully below, we deny their petition.

On December 20, 2000, Gethro Bardette ("Gethro"), a native and citizen of Haiti, entered the United States as a non-immigrant visitor for pleasure, with authorization to remain in the United States until June 19, 2001.  In February 2001, Gethro filed an application for relief from removal and supporting documents, conceding that he had left Haiti by boat and had entered the United States in

---

[1]  Because the petitioners have not challenged on appeal the denial of their petition for withholding of removal under the United Nations Convention on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), filed pursuant to 8 U.S.C. §§ 1158, 1241(b)(3), 8 C.F.R. § 208.16(c), they have abandoned our review of this claim.  See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (holding that, "[w]hen an appellant fails to offer argument on an issue, that issue is abandoned").

August 2000, without authority.[2]  Gethro contended in his application that, if he

returned to Haiti, he would be persecuted by the Lavalas Party on account of his

political opinion and his membership in the "Association des Jeunes du Millenium

pour une Haiti Milleure" ("Youth Group"), which was organized to help young

people "stay out of [] wrongdoing[s]."  On July 24, 2001, the former Immigration

and Naturalization Service ("INS")[3] denied Gethro's application and referred it to

an IJ for further removal proceedings.

On February 19, 2002, Lifaite Bardette ("Bardette") last entered the United

States as a non-immigrant for pleasure, with permission to remain until August 18,

2002.[4]  In June 2002, Bardette filed an application for relief from removal and

supporting documents,[5] asserting that she would be persecuted by the Lavalas

Party, based on Gethro's and her husband's membership in the Youth Group and

---

[2]  Gethro conceded during the evidentiary hearing in these proceedings that, in addition to including other false information in his February 2001, asylum application, he used a false name, "Githo Mike Bardette."

[3]  On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.  This legislation created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department.

[4]  Bardette included in her application for relief from removal that she previously had entered the United States on March 19, 1978, October 22, 2001, and July 14, 2001.

[5]  These supporting documents included (1) birth certificates and passports for each family member, and (2) a certificate of marriage.

3

their political opinion.[6]  On August 22, 2002, the INS also denied Bardette's application and referred it to the IJ for further proceedings.

The INS subsequently served the petitioners with notices to appear ("NTAs"), charging them with removability for either remaining in the United States for a period longer than permitted, pursuant to INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), or for being present in the United States without having been admitted or paroled, pursuant to INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i).  In September 2002, on Gethro's request, the IJ consolidated his case with his family's pending removal proceedings.  Moreover, in November 2002, Bardette and her family appeared before an IJ and conceded the petitioners' removability.  Bardette, however, stated that she intended to renew her application for relief from removal based on political asylum and withholding of removal.

On February 24, 2004, at a hearing on the petitioners' consolidated applications for relief from removal, Bardette and Gethro, who were the only witnesses, offered the following testimony.  Bardette, who was self-employed and owned a fabric shop in Haiti from 1983 through 2000, entered the United States six times before her last entry in February 2002.  After initially stating that she, her husband, and Gethro were active in the Youth Group, Bardette conceded that she,

_____

[6]  Bardette included as riders in her application for relief her husband and her minor children, who also were natives and citizens of Haiti.

4

herself, was not a member, and that the Youth Group's purpose was to help "youth do what was right," including avoiding drugs and prostitution. Gethro joined the organization in 1999. In March 2000, Gethro started hosting a weekly radio program on Radio Caraibe in downtown Port-au-Prince, through which he addressed the youth and told them that "the government wasn't there to help them, that some of them were armed."

Bardette further testified that, on March 31, 2000, after Gethro criticized the Haitian government, six police officers arrested him and two other persons and detained them for two weeks. During this detention, Gethro was beaten and a female colleague allegedly was raped. Upon Gethro's release, Bardette and her family, other than Gethro, moved to another residence, where they resided from 2000 to 2003. Gethro, on the other hand, moved in with a family friend in the neighborhood of Saint-Marc.

One month after Gethro's arrest, four men dressed in civilian clothing came to Bardette's residence and asked about Gethro's whereabouts. Although Bardette did not recognize these men, she believed that they were police officers because "they mentioned it." When Bardette refused to disclose Gethro's address to these men, they entered her residence, looked around, held her at gunpoint, hit her leg with a baton, and took documents relating to the Youth Group. Additionally, in November 2000, when Bardette's husband and Gethro were driving to Gethro's

5

school, an unidentified group of persons stole their vehicle at gunpoint and stated that they knew that Bardette's husband did not like the Lavalas Party. Despite this statement, however, Bardette believed that these persons stole the vehicle because they "needed the car." Bardette did not report this theft. Instead, Bardette arranged for Gethro to travel to the United States in December 2000.[7]

In January 2001, after Gethro's departure and one day after Bardette gave birth to her youngest son, she arrived home and found a note accusing her family of being against the Lavalas Party. In February 2001, Bardette's husband was attacked in their fabric store by men whom she believed belonged to the Lavalas Party. In June 2001, Bardette's husband traveled to the United States with a visitor's visa. Bardette, however, did not leave Haiti with the rest of her children until February 2002, after she was robbed by persons whom she believed were supporters of the Lavalas Party. Bardette further testified that she (1) feared that, if she and her family returned to Haiti, they would be attacked by members of the Lavalas Party; and (2) did not believe that she could relocate within Haiti because her house was in Port-au-Prince.

---

[7] Bardette also testified that, prior to Gethro traveling to the United States in December 2000, he had applied for a visa on April 14, 2000, and had entered the United States on July 10, 2000, after which he had stayed for two months and had not sought asylum, purportedly due to his mother's initial wish that he complete his studies in Haiti.

Gethro also testified, stating that, in 1999, he joined the Youth Group, which sought to educate young people about the social, economic, and political situations in Haiti, and which was supported by the International Republican Institute ("IRI"). As an assistant to the Vice President of the Youth Group, Gethro was in charge of public relations. Additionally, on Fridays from February 2000 through March 31, 2000, he hosted a radio show on Radio Caraibe, which covered the social, political, and economic aspects of Haiti. On March 31, 2000, immediately after Gethro finished his radio show, police officers arrested him and detained him in the national penitentiary for two weeks, during which time he was severely beaten. He ultimately was released due to his parents' efforts. Because he was told that he was mistreated due to his radio show and that his life was in danger, he stopped hosting the radio show after his arrest. He, however, resumed attending his school classes and received unspecified threats.

Gethro further testified that, in July 2000, he left Haiti and came to the United States with his father on vacation, during which visit he did not request asylum or any other form of protection. However, after he returned to Haiti in September 2000, and after witnessing persons steal his father's car at gunpoint and receiving more threats on his way to school, he realized that the situation in Haiti had not changed. Moreover, although he had attempted to live with another family in Saint-Marc, this family ultimately asked him to leave their home because the

7

family believed they were in danger. Gethro also stated that (1) he feared returning to Haiti because of general civil violence against students; and (2) he lied in his February 2001 asylum application because another person actually prepared the application for Gethro to sign.

The government submitted for the IJ's review the U.S. State Department's 2001 Country Report on Human Rights Practices for Haiti ("2001 Country Report"). The 2001 Country Report included that, although Haiti is a republic with an elected president, a bicameral legislature, and a constitution, many of the constitution's provisions are not respected in practice, and the political impasse and violence stemming from the May 2000 election, whereby the Lavalas Party maintained controlled of the Senate, and the November 2000 election of President Aristide, continued in 2001. Although the Haitian National Police ("HNP") had received substantial international assistance and made some initial progress, it had remained a "fledgling institution with inadequate resources," with "[a]llegations of corruption, incompetence, and narcotics trafficking affect[ing] all [of its] levels," and with some members committing human rights abuses, including extrajudicial killings. The HNP and local officials illegally arrested at least 50 persons in 2001, with some of those persons being beaten. Additionally, radio stations continued to receive anonymous threats, including death threats, and the government proved unable or unwilling to provide adequate security to them.

At the conclusion of the evidentiary hearing, the IJ found all of the petitioners removable, denied their applications for asylum and withholding of removal under the INA, and ordered them removed to Haiti. The IJ first discussed that, although Gethro had not attempted to hide his February 2001, asylum application, it did not contain his real name or date of birth, and it fraudulently stated that he had entered without inspection seeking asylum, instead of with a visa. The IJ also noted that, although the alleged persecution had occurred within the past four years and Radio Caraibe still was in existence, Gethro had not produced documentary evidence that corroborated his testimony that he (1) was a leader in the IRI, (2) had a radio show on Radio Caraibe's air waves in 2000, and (3) had been arrested immediately following a radio broadcast. The IJ discussed that it had found "somewhat implausible" and "not particularly credible" Gethro's testimony that, at age 17, he was interviewing political candidates on a large radio broadcast in Port-au-Prince. Moreover, the IJ noted that, although Bardette testified that Gethro had been arrested on March 31, 2000, beaten, and released two weeks later, a photograph that was taken for his visa during that same time period did not reflect that he received numerous and severe beatings.

Additionally, the IJ discussed that, although Bardette had testified that persons with the HNP had beaten her and taken things from her son's room, as well other people stealing her husband's car and robbing her at gunpoint, she did not

9

otherwise provide identification about the persecutors, she did not identify what items were taken from her son's room, and the robbery was for the purpose of taking her money. The IJ explained that, although the political situation in Haiti was "particularly tumultuous," these events involved thefts, instead of activities showing a connection with the family's political activities. The IJ also found either "somewhat odd" or inconsistent the facts that (1) Bardette testified she did not know how Gethro was released from jail but that it was pursuant to a court order, while Gethro testified that his parents had orchestrated the release and made no mention of a judge; (2) Bardette did not know if her husband or Gethro filed a police report relating to the theft of the vehicle; and (3) she did not know whether her husband knew the identity of any of the persons who had beaten him in the fabric shop and accused him of being anti-Lavalas.

The IJ further explained that the petitioners' traveling back and forth to Haiti on different occasions following the onset of the alleged persecution was not "the behavior of individuals who are genuinely in fear of their lives on account of past persecution." The IJ noted that, even if the petitioners had been harassed by members of the Lavalas Party, their reasons why they did not attempt to relocate within Haiti were not compelling. The IJ, then, found as follows:

> [A]lthough the [petitioners] have provided testimony which is for the most part consistent with the statements in the [asylum application], the [c]ourt does not find that they have sustained their burden of proof

10

> to present detailed, specific, and credible testimony regarding their claims for the aforementioned reasons. The fact that the testimony is consistent is not dispositive. Rather, the [c]ourt looks to the failure to present corroborating documentation as well as failure to present detailed and specific information regarding their so-called political activities. The [c]ourt also, as noted above, finds certain salient features of the claims to be somewhat implausible at best and suspect at worst.

The IJ, therefore, concluded that the petitioners had failed to meet their burden for asylum, as well as the higher "more likely than not" burden for withholding of removal under the INA. Moreover, after the petitioners appealed this decision, the BIA summarily affirmed it, without opinion.

The petitioners argue on appeal that, because the IJ either did not make an explicit finding regarding credibility, or he based his findings on speculation and conjecture, this Court should not conclude that the IJ reached an adverse credibility determination that is dispositive on appeal. The petitioners also assert that the IJ erred in finding that they failed to establish past persecution or a well-founded fear of future persecution based on political opinion. The petitioners specifically assert that the IJ erred in requiring them to produce corroborating evidence of past persecution. Furthermore, the petitioners argue that the IJ erred in relying on the fact that they made return trips to Haiti, and in requiring them to establish that they could not avoid future persecution by relocating within Haiti.

11

As a preliminary matter, when, as in this case, the BIA adopts the IJ's opinion in full, instead of rendering its own opinion, we review the IJ's decision. See D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004). To the extent that the IJ's decision was based on a legal determination, our review is de novo. Id. at 817. On the other hand, the IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 817-18 (quoting Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001)). Thus, the IJ's factual determinations will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 125 S.Ct. 2245 (2005).

Also as a preliminary matter, if credible, an alien's testimony may be sufficient to sustain the burden of proof without corroboration. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Id. However, we have concluded that, when an IJ "says not that [the IJ] believes the asylum seeker or [that] [the IJ] disbelieves her . . . the reviewing Court is left in the dark," and that an IJ must make a "clean determination[] of

12

credibility." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (internal quotations omitted). Thus, we concluded in Yang that, although the IJ made a reference to the petitioner's claim as a "ridiculous fabrication" and stated that his testimony was "extremely inconsistent and [made] absolutely no sense whatsoever," these statements did not constitute an adverse credibility determination that was dispositive on appeal. Id.

In the instant case, the IJ noted that Gethro had included false information in his asylum application, as well as failing to produce corroborating evidence. The IJ also discussed that he had found "somewhat implausible" and "not particularly credible" Gethro's testimony relating to his radio show on Radio Caraibe. Similarly, the IJ discussed that (1) Bardette's testimony relating to Gethro being beaten was contradicted by Gethro's visa photograph, and (2) her statements relating to other alleged acts of harassment was either "somewhat odd" or inconsistent. Additionally, the IJ found that the petitioners had not "sustained their burden of proof to present detailed, specific, and credible testimony regarding their claims." Similar to the facts in Yang, however, the IJ did not clearly state that he was making an adverse credibility finding. Indeed, the IJ discussed that the petitioners' testimony was consistent with their allegations in their applications. The IJ, therefore, did not made an adverse credibility determination that is dispositive on appeal.

13

An alien who arrives in, or is present in, the United States may apply for asylum. INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).[8] A "refugee" is defined as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . ..

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). "The asylum applicant carries the burden of proving statutory 'refugee' status." D-Muhumed, 388 F.3d at 818.

To establish asylum eligibility, the petitioner must, with specific and credible evidence, demonstrate (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. If the petitioner demonstrates past persecution, there is a rebuttable presumption that he has a well-founded fear of future persecution. 8 C.F.R § 208.13(b)(1). If he

---

[8] Pursuant to the REAL ID Act, INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), was amended to add "The Secretary of Homeland Security or the Attorney General," as if enacted on March 1, 2003. See Pub.L. 109-13, 119 Stat. 231 (May 11, 2005), Division B, Sec. 101, 8 U.S.C. § 1158(b)(1) and note (1).

cannot show past persecution, then the petitioner must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable. Al Najjar, 257 F.3d at 1289. The subjective component can be proved "by the applicant's credible testimony that he or she genuinely fears persecution," while the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation omitted).

An alien seeking withholding of removal under the INA similarly must show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). The burden of proof for withholding of removal, however, is "more likely than not," and, thus, is "more stringent" than the standard for asylum. Sepulveda, 401 F.3d at 1232.

To the extent the petitioners are challenging the IJ's determination that they failed to establish past persecution on account of membership in a social organization or political opinion, "[p]ersecution on account of . . . political opinion . . . is persecution on account of the victim's political opinion, not the persecutor's." Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437-38 (11th Cir. 2004) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 482, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992) (emphasis in original)). The applicant must present "specific,

15

detailed facts showing a good reason to fear that he will be singled out for persecution on account of such an opinion." Al Najjar, 257 F.3d at 1287. Thus, evidence that either is consistent with acts of private violence, or that merely shows that a person has been the victim of criminal activity, does not constitute evidence of persecution based on a statutorily protected ground. Sanchez, 392 F.3d at 438.

Bardette and Gethro asserted during the evidentiary hearing that, following Gethro's criticizing the government during a broadcast he gave on Radio Caraibe, he was detained and beaten by police officers for two weeks. Moreover, Bardette testified that (1) four men whom she believed were police officers entered her residence, hit her with a baton, and took document's relating to Gethro's youth group; (2) persons who stated that they knew that Bardette's husband did not like the Lavalas Party stopped Bardette's husband and son and stole their vehicle; (3) in February 2001, someone left a note at her home accusing her family of being against the Lavalas Party; and (4) her husband was attacked in the family's fabric store by men whom Bardette believed belonged to the Lavalas Party.

However, assuming for purposes of argument that these acts constituted persecution, instead of "isolated incidents of verbal harassment or intimidation," see Sepulveda, 401 F.3d at 1231 (explaining that "mere harassment does not amount to persecution," and that persecution is "an extreme concept requiring more than a few isolated incidents of verbal harassment or intimidation"), the

16

petitioners did not establish that this persecution was on account of membership in a social group or imputed opinion, see Al Najjar, 257 F.3d at 1287. Bardette only could speculate that members of the Lavalas Party were responsible for entering her residence and assaulting her, stealing her purse, and attacking her husband in their fabric store.

Bardette also conceded that she believed that, despite their statements regarding the Lavalas Party, the persons who stole her husband's vehicle did so because they "needed the car." See Sanchez, 392 F.3d at 438. Although Gethro stated that he was detained immediately following his radio broadcast, he described the message of his broadcasts as including general commentary that "the government wasn't there to help them, that some of them were armed." The note Bardette received in February 2001, also only generally accused her family of "being against" the Lavalas Party. Additionally, the IJ, after determining that the testimony was, at best, weak, did not err in considering the fact that the petitioners failed to produce corroborating evidence. See Yang, 418 F.3d at 1201 (explaining that, when the applicant's testimony is weak, there is a greater need for corroborating evidence). Thus, the petitioners did not present "specific, detailed facts" that demonstrated past persecution based on a protected factor.

Additionally, the petitioners failed to demonstrate, in the alternative, a future threat to their life or freedom in Haiti, based on a protected factor. To the extent

17

the petitioners are arguing that the IJ erred in relying on the fact that they made return trips to Haiti following their entry into the United States in concluding that they did not have a subjective fear, the record reflects that the IJ merely considered this fact, in addition to its other factual findings, in reaching his decision. Indeed, despite that Bardette entered the United States in July and October 2001, and Gethro previously traveled to the United States in July 2000, neither of them sought asylum relief during these visits. Additionally, despite that Gethro and Bardette's husband went to the United States in 2000 and 2001, she remained in Haiti with their remaining five minor children until February 2002.

Moreover, the record does not compel a determination that the IJ erred in concluding that the petitioners failed to establish a well-founded objective fear of future persecution, as the last alleged act of persecution, that is, the theft of Bardette's purse, occurred in February 2002, two years before the petitioners' applications for relief from removal were denied. Gethro also stopped hosting the radio show after his arrest in March 2000, and did not testify that he subsequently was an active member of the Youth Group.

Finally, to the extent the petitioners are arguing that the IJ erred in requiring them to show that they could not avoid future persecution by relocating within Haiti, we recently clarified that a "country-wide" requirement exists, such that "it is not unreasonable to require a refugee who has an internal resettlement alternative

18

in his own country to . . . establish that such an option is unavailable. See Arboleda v. U.S. Att'y Gen., No. 04-13049, slip op. at 896 (11th Cir. Jan. 3, 2006) (quoting Mazariegos v. U.S. Att'y Gen., 241 F.3d 1320, 1327 (11th Cir. 2001)). We also discussed in Arboleda that, since 2001, the regulations have codified the country-wide requirement, and have instructed the IJ to consider whether "under all the circumstances it would be reasonable to expect the applicant [to relocate]." Id. (quoting 8 C.F.R. § 1208.13(b)(2)(ii)).[9] After examining the relevant country reports for Colombia, we concluded in Arboleda that the FARC operates country-wide in Colombia, and that the government, therefore, had failed to show that relocation was a viable option for the petitioners, whom the BIA presumed had suffered past persecution, to escape future persecution. See id. at 899-900.

Unlike the facts in Arboleda, however, the petitioners in the instant case failed to establish past persecution. Thus, they had the burden of establishing a well-founded fear of future persecution that was both subjectively genuine and objectively reasonable. See Al Najjar, 257 F.3d at 1289. Moreover, as discussed

---

[9] The regulations identify the following non-exclusive considerations that are relevant to this "reasonableness" determination:

> whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic or judicial infrastructure; geographical limitations; and social and cultural restraints, such as age, gender, health, and social and familial ties.

See 8 C.F.R. § 1208.13(b)(3).

19

above, the petitioners failed to demonstrate that they will be singled out for persecution on account of a protected factor. Thus, even if we were to conclude that the 2001 Country Report for Haiti established country-wide persecution, a contrary conclusion would not be compelled by this evidence. See Sepulveda, 401 F.3d at 1232 n.7 (affirming IJ's denial of asylum, despite the inclusion in the 1999 and 2000 Country Reports for Colombia that guerillas exercised an influence throughout the country, because the petitioner had failed to establish that she would be singled out for persecution on account of a protected ground).

Accordingly, we conclude that the IJ's denial of asylum and withholding of removal was supported by substantial evidence. See Adefemi, 386 F.3d at 1027; see also Mazariegos, 241 F.3d at 1324-25 n.2 (explaining that, "if an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of [removal]"). We, therefore, deny the petition.

**PETITION DENIED.**