[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-13575
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 27, 2009
THOMAS K. KAHN
CLERK

Agency No. A96-092-884

IVONNE JEANNETE GUZMAN MORALES,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(March 27, 2009)

Before BIRCH, MARCUS and ANDERSON, Circuit Judges.

PER CURIAM:

Ivonne Jeannette Guzman Morales ("Guzman"), through counsel, seeks review of the decision by the Board of Immigration Appeals ("BIA") affirming the order of the Immigration Judge ("IJ") denying her application for withholding of removal and relief under the United Nations Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 U.S.C. §§ 1158, 1231, 8 C.F.R. § 208.16(c). Guzman argues that the IJ erred in finding that she had not suffered past persecution on account of her political opinion and that she had not sufficiently established a well-founded fear of future persecution. Guzman also contends that the IJ erred in finding her ineligible for protection under the CAT. After close consideration of the record and the parties' briefs, we are compelled to agree with the IJ and the BIA's ultimate conclusions regarding Guzman's application for withholding of removal. Because Guzman did not raise the issue of her protection under the CAT before the BIA, we do not have jurisdiction to consider it. Accordingly, the petition is DENIED in part and DISMISSED in part.

## I. BACKGROUND

Guzman is a native and citizen of Colombia. She entered the United States in October 1999 and, in 2003, was issued a notice to appear ("NTA") by the Department of Homeland Security ("DHS"), charging her with removability as an alien who remained in the United States for a time longer than permitted, pursuant

to INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). Administrative Record ("AR") at 339.

Guzman filed an application for asylum and for withholding of removal based on her political opinion in October 2003. Id. at 272-82; 276. In her application, Guzman described how the Revolutionary Armed Forces of Colombia ("FARC") continuously attempted to coerce her into joining their organization and threatened to take reprisals against her and her family should she refuse. Id. at 276. She also expressed her fear of being killed by the FARC if returned to Columbia because of her refusal to join the group. Id. In her asylum application, Guzman also stated that as part of her job she often urged to villagers "to resist the advances" of the FARC and that the FARC threatened her, in part, for doing so.[1] Id. at 282.

In support of her application, Guzman submitted the following documentation, among other things: 1) a personal narrative describing the events giving rise to her decision to flee Columbia; 2) several declarations partly corroborating her narrative; 3) a statement by the physician who treated her after her encounter with the FARC and one by her treating psychologist; 4) the U.S. State Department's Columbia Country Reports on Human Rights Practices for

---

[1] In Columbia, Guzman was employed by a veterinary company that sold and administered vaccines to chicken farms. Guzman's responsibilities included accounting for and assuring delivery of the vaccines to various farms in and around Bogota. Id. at 12.

2003 ("2003 Human Rights Report"); 5) a 2002 Response to Information Request from INS Resource Information Center ("2002 INS Report"); and 6) a 2003 Response to Information Request from the same center ("2003 INS Report"). Id. at 157.

In her narrative, Guzman described how she was abducted and beaten by FARC guerillas on 3 August 1999 while driving back to Bogota from a rural village. Guzman claimed that she was intercepted by three men from the FARC en route. She was forced from her car and into an adjacent forest, stripped to her underwear, threatened, insulted, and beaten about the back with a stick. At some point, one of her tormentors cut her twice on the left side of her head with a knife. After about two hours, the men left, leaving her bound hand and foot, half-naked and bleeding from her wounds. She was found by peasants the next day and received medical treatment from Dr. Enrique Rojas, her family physician. She did not file a report with the police. Id. at 160-61.

Over the next three months, Guzman claimed to have received three threatening phone calls. The first was on 15 August 1999. The caller did not identify himself but did allude to her beating and threatened her and her daughter with further harm. Guzman received a second call on 2 September 1999 in which the caller threatened to burn down her ranch. Finally, on 1 October 1999, Guzman was called a third time and given an ultimatum declaring her a military target. Id.

at 61.  In response, Guzman and her daughter promptly moved to her aunt's house in another part of Bogota.  Id.  Guzman did not report any of the phone calls to the police and left for the United States shortly thereafter.

The declarations and statements provided by Guzman generally corroborated her narrative.  Guzman's friend and neighbor Blanca Stella Herrera de Duran stated that Guzman and her daughter had received a few threats.  Id. at 283.  A declaration from Enrique Rojas Rosas stated that Guzman had received frequent threats because she refused to collaborate with "a group criminal."  Id. at 286.  Mercedes Leonor Arbelaez Serna and Blanca Cecilia Hernandez vouched for Guzman's character as an honest and responsible person.  Id. at 291, 297.  Martha Rojas stated that Guzman had received threats due to her refusal to collaborate with and join the FARC and Ines Morales Quiroga declared that Guzman was persecuted by the FARC "due to belong and collaborate with them."[2]  Id. at 293, 295.

Enrique Rojas treated Guzman after her ordeal with the FARC.  In his statement, he recounted how he provided medical care to Guzman on 3 August 1999 for two wounds on the left side of her head and damage to her scalp, as well as pain throughout her body "originating from being hit."  Id. at 245.  Rojas stated

---

[2] This should probably read "due to refusal to join and collaborate with them," according to the Spanish-language version of this declaration.  See id. at 296.

5

that he applied two mid-size sutures to her head wounds, applied a mild sedative and recommended psychological help.  Id.  A letter from psychologist Sandra Cardenas stated that she began evaluation and psychotherapy with Guzman in October 1999 and found "emotional alterations in her demeanor, ease to tears, sleep disorder, emotional alteration, state of anguish & panic accompanied by paranoia, all generated by traumatic events suffered under a death threat, physical harm and severe lesions to the head and body as well as psychological torture at the hands of the [FARC]."  Id. at 250.

The 2003 Human Rights Report submitted by Guzman noted that "[t]he FARC and ELN [National Liberation Army] terrorists were responsible for a large percentage of civilian deaths" and that "[e]arly in the year, during terrorist bombing campaigns, the number of abuses committed by FARC and ELN terrorists rose significantly; however, the rate of abuses declined over the year due to increased military pressure."  Id. at 206.  According to the report, the FARC and ELN "kidnapped thousands of civilians and at least 25 members of the security forces to help finance subversion and put political pressure on the Government. Victims were held in deplorable conditions and were often tortured both physically and psychologically."  Id.  Additionally, the FARC engaged in widespread recruitment of minors.  Id.

The 2002 INS Report described relocation prospects in Colombia.  Id. at 199.  It quoted various "country experts," one of whom stated that "the FARC has a presence in virtually all of the nation's 32 departments and urban centers and has a country-wide capability to harm."  Id.  The same expert noted that the FARC targeted, inter alia, "peasant activists or anyone else whom the guerrillas believe opposes the FARC's . . . leftists politics or their use of armed tactics."  Id.  The report also noted that the FARC's presence had reached the city of Bogota, where residents were being forced to make payments to FARC members.  Id. at 201.  The 2003 INS Report chronicled a surge in violence in Colombia in 2002 and reported that "the conflict has intensified and civilians are bearing the brunt of increasing levels of political violence."  Id. at 265.

On 27 July 2004, Guzman appeared before the IJ represented by counsel and conceded removability.  Id. at 80.  At the removal hearing, Guzman testified that she first traveled to the United States in May 1999 for ten days to do a training course.  Id. at 99.  She stated that her two daughters, Ivonne and Ingrid, live in the United States.  Id. at 99-100.  Ivonne was attempting to obtain asylum and Ingrid already had legal status in the United States.  Id. at 100.  Ivonne came to the United States in May 1999 and Ingrid came with Guzman in October 1999.  Id. at 101.  Guzman also testified that her mother and sister continue to live in Columbia.  Id.

at 101-02. Guzman offered the following explanation for being threatened and tortured by the FARC on 3 August 1999:

> I was talking to the families that lived in proximity to the farm, that lived around the farm. These were agricultural families, workers. And I would talk to the mothers and tell them not to leave their children alone because they could be taken by the FARC. These were families of employees that worked for the farm. But I didn't have any link to any movement or union or syndicate or anything.

Id. at 104.

After recounting the particulars of her 3 August 1999 run-in with the FARC, Guzman reiterated her conviction that the FARC's objective was to forcibly enlist her into their organization. Id. at 108. She expressed her fear of returning to Columbia "[b]ecause there are [FARC] cells that are spread throughout the entire country," and claimed that she "would feel sentenced to death by the guerilla groups" if forced to return. Id.

On cross-examination, Guzman conceded that she lived unmolested by the FARC at her aunt's house for about twenty days before leaving for the United States. Id. at 109. Moreover, her only physical encounter with the FARC was on the day of her attack in 1999, although she had been working with the same company since 1995. Id. at 110. Guzman also acknowledged that despite her fear that the FARC would harm her family members, her mother and sister still lived in

8

Colombia and had not had problems with the FARC. Id. at 111. Finally, Guzman again surmised that the FARC tortured her in an effort to forcibly recruit her to their cause. Id. at 114.

The IJ found Guzman's testimony generally credible. Id. at 47. He concluded that based on Guzman's application, testimony, and supporting documents, the FARC forcibly tried to recruit her to join its organization by beating and torturing her. Id. at 47-49. However, the IJ found that Guzman's testimony regarding her efforts to warn the peasants against the dangers posed by the FARC was unconvincing and lacking in detail. Id. at 49-50. Moreover, the IJ determined that Guzman's torture by the FARC, while "not a pleasant experience," did not rise to the level of past persecution, even when considered in conjunction with the subsequent threatening phone calls. Id. at 50.

The IJ was also impressed that Guzman was able to live safely with her aunt in the northern part of Bogota for several weeks after she left her apartment. Id. at 50-51. He concluded that because her interaction with the FARC stemmed from her employment, which had brought her into contact with the FARC in the countryside, and she was no longer working for that employer, she would no longer be of interest to the FARC. She also would not be required to journey into those countryside areas where the FARC had previously intercepted her. In addition, the IJ noted that Guzman's mother and sister still reside in Columbia

unmolested by the FARC and so it was not unreasonable to require her to seek internal resettlement in Columbia. Id. at 51. The IJ ultimately concluded that Guzman was ineligible for withholding of removal. Id. at 52.

Turning to her CAT claim, the IJ determined that Guzman had not met her burden of proof because she failed to present any evidence of torture instigated by or acquiesced to by a Colombian government official. Id. The IJ also noted the fact that Guzman's older daughter traveled with Guzman to the United States in May 1999 and did not return to Columbia. The IJ surmised that such a fact could indicate that an ulterior motive of establishing residence in the United States existed before Guzman's fear of the FARC developed. Id. at 52-53. The IJ denied Guzman's application for asylum, withholding of removal, and CAT relief, and ordered her removed to Colombia. Id. at 53.

Guzman filed a notice of appeal with the BIA and claimed, inter alia, that the IJ erred in determining that the harm suffered by Guzman did not amount to persecution. Id. at 23-24. Guzman also contended that she had a well-founded fear of persecution based on a protected ground because the FARC not only tried to recruit her, but also targeted her because of her "sociopolitical activities" and because of an imputed political opinion. Id. at 24-25. In addition, she asserted that there was "more than a 50% chance" that she would be persecuted on account of her political opinion and imputed political opinion if she returned to Colombia. Id.

10

at 25.  Finally, Guzman argued that in light of <u>Arboleda v. U.S. Att'y Gen.</u>, 434 F.3d 1220 (11th Cir. 2006) (per curiam), relocation within Colombia was not viable and the IJ erred when he found that she could relocate to a remote area of the country.  AR at 25.  Guzman did not assert that the IJ erred in rejecting her CAT claim.  The BIA adopted and affirmed the IJ's decision and dismissed Guzman's appeal, specifically noting that she had not met her burden for withholding of removal or for protection under the CAT.  <u>Id.</u> at 2-3.

## II.  DISCUSSION

"We review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion.  Insofar as the Board adopts the IJ's reasoning, we will review the IJ's decision as well."  <u>Al Najjar v. Ashcroft</u>, 257 F.3d 1262, 1284 (11th Cir. 2001) (citations omitted).  In this case, the BIA issued its own opinion with analysis and also adopted the IJ's reasoning.  AR at 2-3.  Therefore, we review the decisions of both the IJ and the BIA.

To the extent that the IJ's and the BIA's decisions were based on a legal determination, our review is <u>de novo</u>.  <u>D-Muhumed v. U.S. Att'y Gen.</u>, 388 F.3d 814, 817 (11th Cir. 2004).  Factual determinations are reviewed under the substantial-evidence test, "which provides that the IJ's decision can be reversed only if the evidence compels a reasonable fact finder to find otherwise."  <u>Chen v. U.S. Att'y Gen.</u>, 463 F.3d 1228, 1231 (11th Cir. 2006) (per curiam) (quotation

marks and citation omitted). We "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." D-Muhumed, 388 F.3d at 818 (quotation marks omitted). Furthermore, we are required to "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).

"An alien seeking withholding of removal under the INA must show that [her] life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion." Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437 (11th Cir. 2004) (per curiam) (quotation omitted). The burden is on the alien to demonstrate that it is more likely than not that she would be persecuted or tortured if she returned to her home country. If she establishes past persecution based on a protected ground, then it is presumed that her life or freedom would be threatened upon return to her country unless DHS:

> shows by a preponderance of the evidence that, among other things, (1) the country's conditions have changed such that the applicant's life or freedom would no longer be threatened upon [her] removal; or (2) that the alien could avoid a future threat to [her] life or freedom by relocating to another part of the proposed country of removal, and it would be reasonable to expect [her] to do so.

12

Id. An alien who cannot show past persecution "may still be entitled to withholding of removal if [she] can demonstrate a future threat to [her] life or freedom on a protected ground." Id. To establish a well-founded fear of future persecution, the applicant must prove a fear that is both "subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289. "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution." Id. "[T]he objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation marks omitted). An alien cannot demonstrate that it is more likely than not that she would be persecuted on account of a protected ground if the IJ finds that the alien could avoid a future threat by relocating to another part of her country. Sanchez, 392 F.3d at 437. Additionally, 8 U.S.C. § 1231(b)(3)(A) "protects against persecution not only by government forces but also by nongovernmental groups that the government cannot control." Id. (quotation marks omitted).

To prove persecution on account of political opinion, the petitioner must show "persecution on account of the victim's political opinion, not the persecutor's." Id. at 437-38. To qualify for withholding of removal based on persecution by a guerilla group on account of political opinion, an alien "must establish that the guerillas persecuted her or will seek to persecute her in the future

13

because of her actual or imputed political opinion." Id. at 438. An alien can prevail on a theory of "imputed political opinion" if she can show that her persecutors falsely attributed an opinion to her and then persecuted her because of that mistaken belief about her views. See Al Najjar v. Ashcroft, 257 F.3d at 1289. "It is not enough to show that she was or will be persecuted or tortured due to her refusal to cooperate with the guerillas." Sanchez, 392 F.3d at 438. Finally, it is well settled that "[w]e lack jurisdiction to consider a claim raised in a petition for review unless the petitioner has exhausted [her] administrative remedies with respect thereto." Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006) (per curiam). This is so even "when an alien, without excuse or exception, fails to exhaust [a] claim, but the BIA nonetheless considers the underlying issue sua sponte." Id.

It is apparent from the record that Guzman suffered a harrowing ordeal at that hands of FARC guerillas in August 1999 and undoubtedly has a genuine subjective fear of future persecution if returned to Columbia. Horrific as her experiences were, however, we must concur with the IJ and BIA's findings regarding the lack of any nexus between Guzman's political opinion and the FARC's alleged persecution. The record before us and the deferential scope of our review require us to do so, notwithstanding where our sympathies may lie. Likewise, we agree with the IJ and BIA's conclusions regarding the objective

14

prong of Guzman's fear of future persecution. The IJ's finding that Guzman's refusal to cooperate was the impetus for the FARC's transgressions is substantially supported by the bulk of the record. In addition, given the IJ's careful consideration of the record evidence, we are not at liberty to disturb his determination that relocation within Columbia would be both successful and reasonable for Guzman. See AR 51-53. Finally, heeding the dictates of our precedent, we conclude that we do not have jurisdiction to entertain Guzman's argument regarding protection under the CAT because that argument was not raised before the BIA. See Amaya-Artunduaga, 463 F.3d at 1250.

## III. CONCLUSION

Guzman seeks review of the BIA's decision affirming the IJ's denial of her application for withholding of removal and relief under the CAT. We conclude that the IJ and BIA's determinations regarding Guzman's application for withholding of removal are supported by substantial evidence. We do not have jurisdiction to consider her argument for protection under the CAT. Accordingly, we DENY the petition in part, and DISMISS it in part.

Petition DENIED, in part, and DISMISSED, in part.

15