[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 7, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-14135
Non-Argument Calendar
_____

BIA Nos. A79-471-146 & A79-471-147

LUZ ELSA CEDIEL,
RAMON BAHAMON-ARDILA,
JUAN SEBASTIAN BAHAMON CEDIEL,
RAMON IGNACIO BAHAMON,

                                                    Petitioners,

versus

U.S. ATTORNEY GENERAL,

                                                    Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

**(March 7, 2006)**

Before ANDERSON, BIRCH and FAY, Circuit Judges.

PER CURIAM:

Luz Elsa Cediel, her husband, Ramon Bahamon-Ardila, and their sons, Juan Sebastian Bahamon Cediel and Ramon Ignacio Bahamon, through counsel, petition for review of the Board of Immigration Appeals' ("BIA's") order affirming the immigration judge's ("IJ's") two decisions, denying their applications for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), filed pursuant to INA §§ 208, 241, 8 U.S.C. §§ 1158, 1231, and for withholding of removal under the United Nations Convention on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), filed pursuant to 8 U.S.C. §§ 1158, 1241(b)(3), 8 C.F.R. § 208.16(c).[1] The petitioners argue that the BIA's determination that they failed to establish statutory eligibility for either asylum or withholding of removal under the INA, or for withholding of removal under the CAT, was not supported by substantial evidence. For the reasons set forth more fully below, we deny their petition.

On May 9, 2000, Luz Elsa Cediel, a native and citizen of Colombia, last entered the United States as a non-immigrant visitor for pleasure, with authorization to remain in the United States for a period not to exceed June 8, 2000. In April 2001, she filed an application for relief from removal and

---

[1] Congress recently directed that all petitions for review will be governed under the permanent provisions of the Illegal Reform and Immigrant Responsibility Act of 1996 ("the IIRIRA"). See Huang v. U.S. Att'y Gen., 429 F.3d 1002, 1008 n.3 (11th Cir. 2005) (citing to the REAL ID Act of 2005, Pub.L. 109-13, 119 Stat 231 (May 11, 2005)).

supporting documents, asserting that, if she returned to Colombia, she would be persecuted by the Revolutionary Armed Forces of Colombia ("FARC"), a guerilla organization, on account of her membership in a particular social group and her political opinion.[2] Cediel specifically contended that, because she had access to confidential, personal and financial data as a Manager for Bancafe, FARC members had asked her to provide them with this information, subjected her to psychological torture through repeated telephone calls at her home, and threatened to kill her.

In September 2001, the former Immigration and Naturalization Service ("INS")[3] served Cediel and her family with notices to appear ("NTAs"), charging them respectively with removability either for remaining in the United States for a period longer than permitted, pursuant to INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), or for failing to comply with the conditions of the non-immigrant status under which he was admitted, pursuant to INA § 237(a)(1)(C)(i), 8 U.S.C.

---

[2] Cediel included as riders in her application for relief her husband, Ramon Bahamon Ardila, and her minor son, Juan Sebastian Bahamon Cediel, who also were natives and citizens of Colombia, and who had entered the United States for pleasure in 1997 and 1998 respectively. On January 23, 2002, Cediel's other son, Ramon Ignacio Bahamon, who also was a native and citizen of Colombia, and who had entered the United States with a student visa in October 1999, filed a separate asylum application because he was older than 21. However, neither Cediel's husband, nor her sons, gave independent grounds for relief. Thus, for purposes of this opinion, references to Cediel also will include her husband and sons.

[3] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. This legislation created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department.

§ 1227(a)(1)(C)(i). Cediel appeared before an IJ and, through counsel, conceded the petitioners' removability.

In November 2003, at a hearing on the petitioners' applications for relief from removal, Cediel and her adult son, Ramon, who were the only witnesses, offered the following testimony. Cediel testified that, through her employment as a Bank Coordinator with Bancafe in Bogota, Colombia, a mix of a public and private bank, she primarily managed governmental accounts and personal accounts for preferential clients, including ministers, persecutors [sic], and other people "of very high importance." Prior to her leaving this position in April 1998, she was expecting to be named a Vice President in Bancafe.

In September 1997, a member of the FARC approached Cediel at Bancafe and asked Cediel to give him financial and personal information for certain Bancafe customers. After Cediel declined to cooperate and the FARC member left the building, Cediel reported the incident to Bancafe's security. Cediel, however, did not report it to her supervisor because Cediel had become very upset. She also never learned whether Bancafe's security ever conducted an investigation.

A few days after this incident, Cediel received at work a telephone call from the same member of the FARC. The caller told her that "it was going to be really good for [Cediel]" if she cooperated with the FARC by providing the previously requested information. Cediel again declined to provide information. After this

4

telephone call, Cediel, who was fearful, neither reported the call to Bancafe's security nor to her supervisors.[4] Cediel also subsequently received eight to ten telephone calls at work, including several "death threats," with the last call occurring in January 1998. Moreover, in November 1997, a member of the FARC called Cediel at home and informed her that, because of her failure to comply with the FARC's demands, the FARC considered her a "military objective." The caller also informed Cediel that the FARC knew of her whereabouts and where she and her family lived. Cediel again did not report this call to anyone. Instead, Cediel and her husband decided to leave Colombia to protect themselves and their family.

In April 1998, Cediel left her job with Bancafe, giving her employer the explanation that she had been sick. Cediel did not tell her employer the real reason, that is, that she had been threatened, because "when this happens in Colombia the only thing that you do is protect yourself and protect your family or you leave, you have to flee." Cediel never tried to relocate to another area of Colombia outside of Bogota because she believed that it would be easier for members of the FARC to find them in a smaller city or town.

---

[4] Cediel conceded that, by not reporting this threat, she knowingly had violated a bank policy to report threats against the security of Colombia. She, however, was aware that, after another employee of Bancafe, who held a less prestigious position, had reported a similar experience to the Bancafe's administration, his complaint had not been investigated, and someone had strapped a bomb to his body and detained him in his office.

After Cediel left Colombia,[5] she made five return trips to Colombia, at approximate six-month intervals, to determine whether it was safe for her family to return. In May 2000, during her last return trip to Colombia, she discovered that her family's home had been vandalized, including a sign painted on the wall, which stated "death to traitors" and had been signed by the FARC. Cediel testified that she believed that, if she returned to Colombia, she would be killed because she had been declared a "military objective." On cross-examination, however, she conceded that FARC only had requested that she give them information on Bancafe's customers, and that she never had been physically harmed in Colombia.

Ramon also testified, stating that, although he had not experienced problems when he had lived in Colombia, he believed that he would be subjected to harm if he returned to Colombia because FARC members had told his mother that she was a "military objective" and that her entire family would be killed. Ramon stated, as well, that he (1) had sought asylum because he was afraid, and (2) did not believe that he could avoid future persecution by relocating within Colombia because "the guerillas know where everybody is there."

The government submitted for the IJ's review the U.S. State Department's 2000 Country Report on Human Rights Practices for Colombia ("2000 Country

[5] In her application for relief from removal, Cediel stated that she left Colombia and came to the United States with her minor son for the first time in May 1998.

6

Report"). The 2000 Country Report included that Colombia is a constitutional, multiparty democracy, but that the government's human-rights record remained poor. Internal security is maintained by both the armed forces and the national police. Two major guerilla groups, with the FARC being the largest, consist of an estimated 11,000 to 17,000 full-time combatants, who are organized into more than 100 semi-autonomous groups. The guerillas "exercised a significant degree of territorial influence and initiated armed action in nearly 1,000 out of 1,085 municipalities [approximately 92%] during [2000], which was approximately the same level as 1999." Indeed, the guerillas (1) "regularly attacked civilian populations, committed massacres and summary executions and killed medical and religious personnel"; (2) held more than 1,000 kidnapped civilians and 500 kidnapped soldiers and police; and (3) "regulated travel, commerce and other activities."

Additionally, the record included the U.S. State Department's June 1997 Profile of Asylum Claims and Country Conditions for Colombia ("1997 Profile"), which advised that an estimated 10,000 to 15,000 full-time guerrillas had organized in over 100 groups and represented a "growing challenge to [g]overnment security forces," along with influencing more than half of the country's municipalities. Guerilla targets included those persons who (1) refused to submit to recruitment or extortion, and (2) were suspected of collaborating with

7

authorities.  This 1997 Profile, however, also discussed that Colombia is a large country of more than a million square kilometers and 35.5 million people, that violence generally is centered in a few provinces, and that persons "fleeing guerillas or police/military harassment or threats in conflictive zones usually are able to find peaceful residence elsewhere in the country."

The IJ found all of the petitioners removable, denied their applications for asylum and withholding under the INA and withholding of removal under the CAT, and ordered them removed to Colombia.  The IJ discussed that, although he had found Cediel's testimony to be "candid and consistent with her application for asylum," he had found illogical her failure to stop a man who had entered Bancafe for the sole purpose of soliciting a criminal act.  The IJ also explained that he had found illogical Cediel's failure to report the subsequent threatening phone calls, and he believed that the government likely would have taken further action if notified.  Moreover, the IJ noted that Cediel did not leave Colombia until May 1998, did not make any effort to learn if conditions had changed during her return trips to Colombia, and could have gathered this same information by calling her friends.  The IJ concluded that, Cediel's credibility was "somewhat diminished."

The IJ further determined that Cediel had failed to establish past persecution or a well-founded fear of future persecution.  The IJ discussed that, although Cediel had alleged psychological torture in her application for relief, she had

8

presented no evidence showing that anyone had harmed her, despite that members of the FARC knew where she worked and lived. The IJ explained that, with the passage of at least three years since Cediel's last trip to Colombia, Cediel's resignation from Bancafe, and the foreclosure of her family home, it was unlikely that members of the FARC would be interested in her when she returned to Colombia. The IJ found that Cediel had failed to show that the government would be unwilling to protect her in the future. Moreover, the IJ explained that Cediel's refusal to cooperate with a gorilla organization did not necessarily establish the expression of a political opinion.

Based on these findings, the IJ concluded that Cediel had failed to show that a reasonable person in her situation would fear returning to Colombia on account of one of the five statutory factors and, thus, that she did not qualify for asylum. The IJ determined that, because Cediel had failed to meet her lower burden of proof for asylum, she also could not establish eligibility for withholding of removal. The IJ also explained that Cediel was not eligible for withholding of removal under the CAT because she failed to present evidence showing, much less allege, that she had been tortured by the act, acquiescence, or consent of an official or a person acting in an official capacity.

Cediel appealed the IJ's decisions to the BIA, arguing that the IJ (1) failed to consider all of the evidence before him in rendering his decision, including

9

evidence as to the conditions of the country; (2) erred by finding that Cediel did not suffer past persecution, or have a well-founded fear of future persecution; (3) failed to cite to support in the record for his findings that Cediel violated Bancafe's policies by not reporting the threats, and that the Colombian authorities would have taken actions to protect her; (4) failed to give Cediel's testimony proper weight; and (5) erroneously relied on the fact that Cediel did not attempt to relocate within Colombia when the evidence in the record demonstrated that the FARC had a country-wide presence.

In dismissing this appeal, the BIA explained that, assuming that Cediel had testified credibly, she had not established either a well-founded fear of persecution, or that it is more likely than not that she would be persecuted on account of a protected ground. The BIA discussed that the record reflected that (1) "the FARC simply wanted information to which the respondent had access"; and (2) Cediel had not shown that the FARC had threatened her because of any imputed political opinion or for any other protected ground. Additionally, the BIA concluded that Cediel had failed to show that she was eligible for withholding of removal under the CAT because she had not alleged that she would be subjected to torture inflicted by, or at the instigation or consent of, a public official or other person acting in an official capacity.

10

The petitioners argue on appeal that they established eligibility for asylum and withholding of removal by showing through both Cediel's credible testimony and background documentary evidence that, because of Cediel's membership in a social group, that is, her employment with Bancafe, or based on her imputed political opinion, they have a well-founded fear that they will be persecuted upon their return to Colombia. The petitioners also contend that the IJ failed to take into account the country conditions in Colombia in finding that Cediel's acts were illogical and that the government would have protected her if she had reported the threats. Moreover, the petitioners argue that they established eligibility for withholding of removal under the CAT by showing that it was more likely than not that they will be tortured upon their return to Colombia.

Because the BIA did not expressly adopt the IJ's opinion in the instant case, we review only the BIA's decision. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (holding that we "review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion"). To the extent that the BIA's decision was based on a legal determination, our review is de novo. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). On the other hand, the BIA's factual determinations are reviewed under the substantial evidence test, and we "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."

Al Najjar, 257 F.3d at 1283-84 (quotation and marks omitted). Thus, the BIA's factual determinations will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 125 S.Ct. 2245 (2005).

As a preliminary matter, if credible, an alien's testimony may be sufficient to sustain the burden of proof without corroboration. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Id. However, when an IJ "says not that [the IJ] believes the asylum seeker or [that] [the IJ] disbelieves her . . . the reviewing Court is left in the dark," and that an IJ must make a "clean determination[] of credibility." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (internal quotations omitted). Thus, we concluded in Yang that, although the IJ made a reference to the petitioner's claim as a "ridiculous fabrication" and stated that his testimony was "extremely inconsistent and [made] absolutely no sense whatsoever," these statements did not constitute an adverse credibility determination that was dispositive on appeal. Id.

In the instant case, the IJ explained that, because he had found that Cediel's acts were illogical and unreasonable, he had determined that her credibility was

12

"somewhat diminished."  Similar to the facts in <u>Yang</u>, however, the IJ did not clearly state that he was making an adverse credibility finding.  <u>See</u> <u>id.</u>  Indeed, the IJ also stated that  he had found Cediel's testimony to be "candid and consistent with her application for asylum."  Moreover, the BIA, in affirming the IJ's opinion, assumed for purposes of argument that Cediel's testimony was credible and, instead, dismissed the appeal based on its determination that she failed to establish statutory eligibility for relief from removal.  We, therefore, do not conclude that either the IJ or the BIA made an adverse credibility determination that is dispositive on appeal.

An alien who arrives in, or is present in, the United States may apply for asylum.  INA § 208(a)(1), 8 U.S.C. § 1158(a)(1).  The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee."  INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).[6]  A "refugee" is defined as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion,

---

[6] Pursuant to the REAL ID Act, INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), was amended to add "The Secretary of Homeland Security or the Attorney General," as if enacted on March 1, 2003.  <u>See</u> Pub.L. 109-13, 119 Stat. 231 (May 11, 2005), Division B, Sec. 101, 8 U.S.C. § 1158(b)(1) and note (1).

nationality, membership in a particular social group, or political opinion . . ..

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). "The asylum applicant carries the burden of proving statutory 'refugee' status." D-Muhumed, 388 F.3d at 818.

To establish asylum eligibility, the petitioner must, with specific and credible evidence, demonstrate (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. If the petitioner demonstrates past persecution, there is a rebuttable presumption that he has a well-founded fear of future persecution. 8 C.F.R § 208.13(b)(1). If he cannot show past persecution, then the petitioner must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable. Al Najjar, 257 F.3d at 1289. The subjective component can be proved "by the applicant's credible testimony that he or she genuinely fears persecution," while the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation omitted).

An alien seeking withholding of removal under the INA similarly must show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political

14

opinion." See INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). The burden of proof for withholding of removal, however, is "more likely than not," and, thus, is "more stringent" than the standard for asylum relief. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 (11th Cir. 2005).

The statutes governing asylum and withholding of removal protect not only against persecution by government forces, but also against persecution by non-governmental groups that the government cannot control, such as the FARC. See Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437 (11th Cir. 2004). However, "[p]ersecution on account of . . . political opinion . . . is persecution on account of the victim's political opinion, not the persecutor's." Id. at 437-38 (quoting INS v. Elias-Zacarias, 502 U.S. 478, 482, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992) (emphasis in original)). The applicant must present "specific, detailed facts showing a good reason to fear that he will be singled out for persecution on account of such an opinion." Al Najjar, 257 F.3d at 1287. Thus, evidence that either is consistent with acts of private violence or the petitioner's failure to cooperate with guerillas, or that merely shows that a person has been the victim of criminal activity, does not constitute evidence of persecution based on a statutorily protected ground. Sanchez, 392 F.3d at 438. Furthermore, although the INA does not define persecution, we have explained that "mere harassment does not amount to persecution," and that persecution it as "an extreme concept requiring more than

15

a few isolated incidents of verbal harassment or intimidation." Sepulveda, 401 F.3d at 1231 (internal quotations and marks omitted).

In Sanchez, we examined a petitioner's challenge to the IJ's decision that the petitioner was not eligible for withholding of removal because the petitioner had not shown that the FARC's interest in her was related to a statutorily protected ground. See Sanchez, 392 F.3d at 436. In support of the petitioner's argument that this decision was erroneous, she cited to her testimony that, after she refused to cooperate with the FARC, and because she was "not in agreement with the way [FARC had] destroyed the country," the FARC had demanded money from her, and, after she had left Colombia, had threatened her and another family member who had refused to cooperate. See id. We determined that the petitioner merely had established that the FARC had harassed her due to her refusal to cooperate with it, and she had failed to show actual or imputed political opinion, much less any connection between the petitioner's alleged political opinion and the FARC's alleged persecution. See id. at 438. We, therefore, concluded that the petitioner was not eligible for withholding of removal. See id.

Cediel contended in her application for relief, as well as during the evidentiary hearing, that members of the FARC had declared her a "military objective" and had threatened to kill her because she had refused to supply the FARC with personal and financial information about certain Bancafe customers.

16

However, assuming for purposes of argument that these threats constituted persecution, instead of "isolated incidents of verbal harassment or intimidation," see Sepulveda, 401 F.3d at 1231, the petitioners did not establish that this persecution was on account of membership in a social group or imputed opinion, see Al Najjar, 257 F.3d at 1287. Cediel conceded that she was targeted based on access to information as a manager within Bancafe, not because of any membership within a political organization. Additionally, similar to the facts in Sanchez, Cediel alleged that members of the FARC harassed her solely due to her failure to cooperate by giving them information, which was insufficient to prove that she qualified for asylum. See Sanchez, 392 F.3d at 438. Thus, the petitioners did not present "specific, detailed facts" that demonstrated past persecution based on a protected factor.

Furthermore, the petitioners failed to demonstrate, in the alternative, a future threat to their life or freedom in Colombia, based on a protected factor. As the IJ noted, the last alleged threat against Cediel's life occurred in May 2000, more than three years before the petitioners' applications for relief from removal were denied. Because Cediel left her employment with Bancafe in April 1998, she now also would be unable to cooperate with the FARC by giving them information about Bancafe customers.

17

To the extent Cediel is arguing that the BIA ignored documentary evidence in the record relating to country conditions in Colombia, the BIA must consider all evidence introduced by the applicants before deciding whether to grant relief from removal. See Forgue, 401 F.3d at 1287. Moreover, although, under the "country-wide" requirement, "it is not unreasonable to require a refugee who has an internal resettlement alternative in his own country to . . . establish that such an option is unavailable," see Mazariegos v. Office of U.S. Att'y Gen., 241 F.3d 1320, 1327 (11th Cir. 2001), we recently decided, after examining the 1999 and 2000 Country Reports for Colombia, that the FARC operates country-wide in Colombia, and that the government, therefore, had failed to show that relocation was a viable option for the petitioners, whom the BIA presumed had suffered past persecution, to escape future persecution, see Arboleda v. U.S. Att'y Gen., No. 04-13049, manuscript op. at 6-7 (11th Cir. January 3, 2006). In reaching this determination, we also clarified that, to the extent evidence in the 1997 Profile was contradictory, the more recent Country Reports were more reliable. See Arboleda, No. 04-13049, manuscript op. at 9-10.

Unlike the facts in Arboleda, however, the petitioners in the instant case failed to establish past persecution. The petitioners, instead of the government, had the burden of establishing a well-founded fear of future persecution that was both subjectively genuine and objectively reasonable. See Al Najjar, 257 F.3d at 1289.

18

Moreover, as discussed above, the petitioners failed to demonstrate that they will be singled out for persecution on account of a protected factor. Thus, a contrary conclusion is not compelled by the evidence in the 2000 Country Report. See Sepulveda, 401 F.3d at 1232 n.7 (affirming IJ's denial of asylum, despite the inclusion in the 1999 and 2000 Country Reports for Colombia that guerillas exercised an influence throughout the country, because the petitioner had failed to establish that she would be singled out for persecution on account of a protected ground). The IJ's denial of asylum and withholding of removal, therefore, was supported by substantial evidence. See Adefemi, 386 F.3d at 1027; see also Mazariegos, 241 F.3d at 1324-25 n.2 (explaining that, "if an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of [removal]").

Finally, to the extent the petitioners are challenging the denial of their applications for withholding of removal under the CAT, to be entitled to mandatory withholding of removal under the CAT, an applicant must establish that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). "Torture" is defined as:

> any act by which severe pain or suffering, whether physical or mental,
> is intentionally inflicted on a person for such purposes as obtaining
> from him or her or a third person information or a confession,
> punishing him or her for an act he or she or a third person has
> committed or is suspected or having committed, or intimidating or
> coercing him or her or a third person, or for any reason based on

19

discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).

"Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 U.S.C. § 208.18(a)(2). We also has concluded that the burden of proof for an applicant seeking withholding of removal under the CAT, like that for an applicant seeking withholding of removal under the INA, is higher than the burden imposed on an asylum applicant. Al Najjar, 257 F.3d at 1303-04. Thus, if a petitioner fails to demonstrate a "well-founded fear of persecution" sufficient to support an asylum claim, he or she likewise cannot demonstrate "torture" sufficient to warrant relief under the CAT. Id.

Because the petitioners failed to demonstrate a "well-founded fear of persecution," they cannot meet the higher burden of demonstrating "torture" sufficient to warrant CAT relief. See id. Regardless, even if the petitioners established that, upon their return to Colombia, they will suffer "an extreme form of cruel and inhuman treatment" by members of the FARC, they did not allege that they will be tortured by a "public official or other person acting in an official capacity." See 8 C.F.R. § 208.18(a)(1). The BIA's determination that the

petitioners were not eligible for withholding of removal under the CAT, therefore, was supported by substantial evidence in the record.

Accordingly, we conclude that substantial evidence supports the BIA's determination that the petitioners failed to establish statutory eligibility for either asylum or withholding of removal under the INA, or for withholding of removal under the CAT. We, therefore, deny the petition.

**PETITION DENIED.**