[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 12, 2006
THOMAS K. KAHN
CLERK

No. 05-14804
Non-Argument Calendar

_____

Agency No. A95-460-274

PAULIN MUJAJ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(April 12, 2006)**

Before ANDERSON, BIRCH and FAY, Circuit Judges.

PER CURIAM:

Paulin Mujaj, through counsel, petitions for review of the Board of

Immigration Appeals' ("BIA's") order affirming the immigration judge's ("IJ's")

decision denying his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), pursuant to INA §§ 208, 241, 8 U.S.C. §§ 1158, 1231, and for withholding of removal under the United Nations Convention on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), pursuant to 8 U.S.C. §§ 1158, 1241(b)(3), 8 C.F.R. § 208.16(c).[1] Mujaj argues that the BIA's and the IJ's determinations that he failed to establish statutory eligibility for either asylum or withholding of removal under the INA, or for withholding of removal under the CAT, were not supported by substantial evidence. For the reasons set forth more fully below, we deny Mujaj's petition.

On June 29, 2001, Mujaj, a native and citizen of Albania, entered the United States without being admitted or paroled after inspection by an immigration officer. In May 2002, the former Immigration and Naturalization Service ("INS")[2] served Mujaj with a notice to appear ("NTA"), charging him with removability for being present in the United States without being admitted or paroled, or for

---

[1] Congress has directed that all petitions for review now will be governed under the permanent provisions of the Illegal Reform and Immigrant Responsibility Act of 1996 ("the IIRIRA"). See Huang v. U.S. Att'y Gen., 429 F.3d 1002, 1008 n.3 (11th Cir. 2005) (citing to the REAL ID Act of 2005, Pub.L. 109-13, 119 Stat 231 (May 11, 2005)).

[2] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. This legislation created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department.

2

arriving in the United States at any time or place other than designated by the Attorney General, pursuant to INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). Mujaj appeared before an IJ and, through counsel, conceded his removability. After Mujaj declined to designate a country of removal, the IJ designated Albania. Mujaj, however, filed an application for relief from removal, asserting that, if he returned to Albania, he would be persecuted on account of his political opinion and his membership in the Albanian Democratic Party ("DP").

In April 2004, at a hearing on Mujaj's application for relief from removal, Mujaj, who was the only witness, testified that he was born in December 1965, in the city of Shkodera, Albania, the part of the country that is presently known as Malsi E Madhe. In February 1988, he graduated from the High Institute of Agriculture and received a position as an agronomist. In December 1990, when he began supporting the DP, he participated in a demonstration in Shkodera, during which a statute of Stalin was toppled. Although Mujaj contended that he was one of a group of persons who was beaten with sticks by the police during this demonstration, he conceded that he did not subsequently seek medical treatment.

In January 1991, Mujaj was arrested in the village of Selca, based on his participation in running an election.[3] He then was taken to the police station in

_____

[3] In Mujaj's application for relief from removal, he included that, in January 1991, he became one of the founding members of the DP in the Malsi E Madhe district, with his

3

Shkodera and detained for 24 hours, during which period he was interrogated and beaten. In April 1991, he again was arrested by the Shkodera police, based on his participation in an unlawful demonstration in front of the Executive Committee's Building. Following this arrest, the police placed him in a small room with 34 to 40 other people for 3 days, did not give either him or the other arrested persons food or water, and beat those persons who were in the front line. The police also did not release Mujaj until he signed a document vowing never to participate in another unlawful demonstration.

By the end of 1991, the communist regime was ending in Albania, and Mujaj lost his position as an agronomist. In March 1992, after the DP won the elections in Albania, Mujaj was given a position with the Directory of Agriculture in the city of Koplik. Moreover, in December 1992, Mujaj became a full member of the DP.

In June 1997, Mujaj was beaten by two masked men while he was coming home from the village of Vermashi, at which he had been preparing for governmental elections. During this encounter, the masked men threatened that Mujaj and his family would be killed unless Mujaj ceased his DP activities. Mujaj did not go to a conventional hospital after this beating and, thus, did not have

responsibilities including spreading the DP influence throughout his work area in Kelmendi.

medical records, but he did consult a "she doctor" regarding injuries to his face. Moreover, in June 1997, when the Socialist Party ("SP") regained power in Albania, Mujaj lost his government job and began tending a family farm.

In September 1998, when a DP official was killed in Tirane, Mujaj and other DP members drove to Tirana to view his body and pay their respects. During their drive back to Shkodera, someone shot at their vehicle. As a result of this shooting, the vehicle's back tires were blown out and the trunk was filled with bullet holes, but no one was injured. Although Mujaj initially testified that someone had recognized the vehicle as being owned by the DP chairman, he subsequently conceded that the vehicle's license plate only revealed the owner's city of residence. Mujaj and the other persons in the vehicle did not report this incident because they were in a different district when it occurred, and the DP headquarters in Tirana informed them that DP activists were targets of assassination.

On June 24, 2001, at approximately 10 p.m., after Mujaj had traveled to the Village of Stare to compile for the DP a list of legitimate voters for parliamentary elections that were set for that same month, he was being driven home when the driver of the vehicle noticed a large rock in the middle of the road and stopped the vehicle. When Mujaj and the driver got out of the vehicle to move this rock, five men, including two policemen, two members of the SP, and the Secretary General

for the Village of Stare, jumped out of the bushes, threatened to kill him unless he stopped his duties with the DP, and beat him until he was unconscious. Mujaj again did not seek medical attention after this beating. He, instead, reported it to other members of the DP, who advised him to leave Albania.

Mujaj had been living with his parents, who had been threatened, but had not been physically harmed. Mujaj, however, went into hiding after this attack, until he left Albania on June 26, 2001. Mujaj also testified that he relinquished his commission for the June 2001 elections because he was afraid for his life.

In addition to this testimony, Mujaj submitted as evidence copies of: (1) the Department of State's Profile of Asylum Claims and Country Conditions ("Profile"), dated March 2004; (2) his DP membership card, dated December 1992, along with a translation of this document; and (3) his passport. On cross-examination, Mujaj contended that he did not have more corroborating evidence to introduce because, despite the fact that he had relatives still living in Albania, he had no one to obtain documents for him, and he never thought about contacting the chairman of the DP for help. Mujaj agreed that his parents subsequently had not had any problems in Albania, other than some threats. Mujaj also conceded that, although the person with whom he had been riding in 2001 during the shooting

6

also had moved to the United States, Mujaj had not asked this person either to testify or to submit a supporting affidavit.

The Profile included that, from World War II until 1990, Albania was ruled by a repressive Communist regime. A number of political parties participated in an emerging democratic system during the violent period of 1990 through 1992, including the DP and the SP. Albania made steady progress towards democratization until 1997, when the collapse of pyramid investment schemes lead to an "almost total breakdown of the forces and institutions of order." In March 1997, however, all of the major parties reached an agreement and the authorities established sufficient public order to allow for elections in June 1997. The SP won these elections, and had since remained in power. This Profile also included that Albania remained a country with a high degree of organized crime, corruption, inadequate police protection; however, no major outbreaks of political violence had occurred since 1998, and neither the government nor the major political parties engaged in policies of abuse or coercion against their political opponents. It also explained that, "[t]hough serious political repression existed in the past, there are no indications of systemic political persecution in Albania at the present time."

Mujaj also submitted for the record the U.S. State Department's 2001 and 2003 Country Reports on Human Rights Practices for Albania ("2001 and 2003

7

Country Reports"). The 2001 Country Report stated that Albania is "a republic with a multiparty parliament, a Prime Minister, and a President, elected by Parliament," and that the SP won the majority of parliamentary seats during the 2001 general elections. In 2001, "[t]he [g]overnment's human rights record was poor in many areas; however, there were some improvements." Albania "continued to experience high levels of violent crime, although statistics indicated a decrease in the number of violent incidents from the previous year." Moreover, although the DP credibly reported some incidents of police harassment of its members for political reasons, there were no confirmed cases of political killing or disappearances by the government or its agents, and the killings that occurred throughout the country usually were "the result of individual or clan vigilante actions connected to traditional 'blood feuds' or criminal gang conflicts."

The 2003 Country Report included, among other things, that (1) Albania's human rights record remained poor in some areas; and (2) the DP credibly reported some instances of police harassment of its members. This report, however, similar to the 2001 Country Report, stated that (1) there were no confirmed cases of political killings or disappearances by the government or its agents, (2) many killings that had occurred throughout the country were the result of traditional

"blood feuds" or criminal gang conflicts, and (3) there were some improvements in its human rights record.

The IJ found Mujaj removable, denied his application for asylum and withholding under the INA and for withholding of removal under the CAT, and ordered him removed to Albania. In summarizing the evidence, the IJ explained that, despite being represented by counsel, Mujaj: (1) failed to identify the specific political activities in which he was engaged, or explain what injuries he had sustained, when he was arrested and beaten in January 1991; (2) failed to identify the demonstration in which he was participating when he was arrested in April 1991; (3) did not testify as to any persecution from 1991 through 1997; (4) provided limited details relating to his being stopped and beaten by masked men in June 1997; (5) changed his testimony regarding the chairman's vehicle, at which persons threw stones, and conceded that the majority of persons in Shkodera were members of the DP; (6) did not explain why he was able to recognize persons involved in the beating he received in June 2001; (7) did not testify as to where he went into hiding; (8) was not "straightforward" concerning his marital status; (9) did not ask one of the witnesses who was living in the United States to testify at his hearing; (10) gave only general details about his political activities; and

9

(11) provided no physical documentation of his DP membership and duties, other than a copy of one side of a card dated 1992.

The IJ further discussed that Mujaj's allegations stemmed from three distinct periods in Albanian history, that conditions in present-day Albania had improved significantly, and that Mujaj's testimony on what occurred in 2001 was not consistent with country conditions, as outlined in the Profile and the Country Reports for 2001 and 2003. The IJ then determined that Mujaj's testimony "[was] not sufficiently detailed, consistent, or believable, to provide a plausible and coherent account of the basis for his fears and thus [could] not suffice to establish [h]is eligibility for asylum without corroborating evidence." The IJ explained that, other than submitting a one-sided copy of a DP membership card dating from 1992, Mujaj had failed to provide such corroborating evidence, and that he could have obtained such evidence. The IJ also determined that Albania had undergone a "fundamental and significant change in country conditions," such that people now could express their political opinions.

Alternatively, the IJ explained that, even if it were to accept Mujaj's testimony as true, (1) Mujaj had provided insufficient details relating to his alleged political activities and persecution, (2) his allegations were primarily related to Albania's period of political crisis, and (3) his claim that he could not relocate was

10

belied by the fact that his family had remained in Albania unharmed.  Thus, the IJ

found that Mujaj had failed to establish either past persecution or a well-founded

fear of future persecution on account of a protected ground for asylum relief, and

that he could not meet the higher standard for withholding of removal.

Additionally, the IJ concluded that Mujaj was not entitled to CAT relief because

(1) CAT relief had a higher burden of proof than asylum relief, and (2) Mujaj could

not show persecution, much less torture, on the part of the government or any

public official in Albania.

On Mujaj's appeal of this decision, the BIA adopted and affirmed the IJ's

decision.  The BIA, however, also commented as follows:

> We find no error in the [IJ's] determination that the respondent failed
> to submit sufficient credible evidence to establish eligibility for
> asylum. [Footnote omitted].  We further find no error in the [IJ's]
> assessment based on the Department of State's Report on Human
> Rights Practices (2002) that conditions in Albania have improved
> dramatically since 1997.  Given the improvement in conditions in
> Albania, including free and fair multiparty elections in 2000 and 2003,
> the record fails to demonstrate that it is more likely than not that the
> respondent would be persecuted if he returns to Albania, thereby
> leaving him ineligible for withholding of removal.  The respondent
> failed to show that he suffered mistreatment at the hands from any
> government or public official.  As protection under the [CAT] is
> limited to torture from public officials or governmental sources, the
> respondent has failed to demonstrate that he is eligible for protection
> from removal. [Citation omitted].  Accordingly, the appeal is
> dismissed.

11

Mujaj argues on appeal that he established past persecution on account of his political opinion and membership in the DP through his testimony and by providing corroborating evidence of this past persecution. Mujaj cites in support to the 2003 State Department Report, which reflected that the government's human rights record had remained poor, and he argues that his multiple acts of persecution, along with the loss of his job in 1996, would not have occurred in the absence of his political opinion. Mujaj also contends that he established a well founded fear of future persecution by showing that: (1) he was beaten and threatened numerous times by members of the SP and the police, at either the acquiescence, or the assistance, of the government; (2) he could not avoid future persecution by relocating within Albania; and (3) serious problems remained in Albania. Finally, Mujaj asserts, in the alternative, that he should have been granted withholding of removal under the INA or the CAT because it is more likely than not that he will be persecuted, and there is a clear probability that he will be tortured, if he is forced to returned to Albania.

When the BIA issues a decision, we review "only that decision, except to the extent that the BIA expressly adopts the IJ's decision." Chacon-Botero v. U.S. Att'y Gen., 427 F.3d 954, 956 (11th Cir. 2005). "Insofar as the BIA adopts the IJ's reasoning, we will review the IJ's decision as well." Id. (internal quotation

12

and marks omitted). Because the BIA adopted the IJ's decision, as well as articulating its reasons for doing so, we review the decisions of both the IJ and the BIA in deciding Mujaj's petition. See id. (reviewing the decisions of both the IJ and the BIA when the BIA adopted the IJ's reasoning and briefly articulated its reasons for doing so).

To the extent that the IJ's and the BIA's decisions were based on legal determinations, our review is de novo. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). On the other hand, their factual determinations are reviewed under the substantial evidence test, and we "must affirm the [] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (quotation omitted). "Under the substantial evidence test, we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 125 S.Ct. 2245 (2005). A finding of fact will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Id.

A credibility determination also is reviewed under the substantial evidence test; thus, we "may not substitute [our] judgment for that of the [IJ] with respect to

13

credibility findings." D-Muhumed, 388 F.3d at 818. If credible, an applicant's testimony may be sufficient to sustain the burden of proof without corroboration. Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005). "The weaker an applicant's testimony, however, the greater the need for corroborative evidence." Id. Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments. See In re B-, 21 I & N Dec. 66, 70 (BIA 1995); see also Dailide v. U.S. Att'y Gen., 387 F.3d 1335, 1343 (11th Cir. 2004) (affirming the BIA's adverse credibility determination, which was based upon its finding that the alien's testimony conflicted with his answers to interrogatories and other documentary evidence).

"Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). However, "an adverse credibility determination does not alleviate the [fact finder's] duty to consider other evidence produced by an asylum applicant." Id. If an applicant produces evidence beyond his own testimony, "it is not sufficient for the [fact finder] to rely solely on an adverse credibility determination in those instances." Id. Furthermore, "the [fact finder] must offer specific, cogent reasons for an adverse credibility finding." Id. (quotation omitted). "Once an adverse credibility finding is made, the burden is on

14

the applicant alien to show that the [fact finder's] credibility decision was not supported by 'specific, cogent reasons[,]' or was not based on substantial evidence." Id. (quotation omitted).

Here, the IJ offered 11 "specific, cogent reasons" for her adverse credibility finding. These reasons also were supported by substantial evidence in the record. Mujaj did not identify specifically what activities he was engaged in when he was arrested, detained, and beaten in January 1991, nor did he explain how, if he was, injured. Other than stating that he engaged in a demonstration in front of the Executive Committee's Building in April 1991, he did not identify the reason for this demonstration. Mujaj also provided limited details relating to his being stopped and beaten by masked men in June 1997, as well as fluctuating in his testimony between whether one or more men were involved and again not providing medical documentation.

Although Mujaj initially testified that someone recognized the vehicle in which he was riding in September 1998, as being owned by the DP's chairman, he subsequently conceded that the vehicle's license plate only identified the owner's city of residence. Mujaj also did not explain how he knew that the men who beat him in June 2001, were members of the SP and the Secretary General for the Village of Stare, and he agreed that he, again, did not seek medical treatment after

15

the beating. Additionally, Mujaj conceded that, although the person with whom he was riding in 2001, during the shooting, also was living in the United States, he had not asked him to testify. Mujaj agreed that he had relatives still living in Albania who could have obtained documents, and that he never attempted to get supporting documents from the chairman of the DP. See Yang, 418 F.3d at 1201.

Thus, Mujaj has failed to show that the IJ's adverse credibility determination "was not supported by 'specific, cogent reasons[,]' or was not based on substantial evidence." See Forgue, 401 F.3d at 1287. Regardless, as the government asserts, even if the IJ erred in reaching her adverse credibility determination, and even if Mujaj established past persecution and that this persecution was on account of his political opinion, he failed to establish eligibility for asylum or withholding of removal because of changed country conditions in Albania, and his ability to avoid future persecution by relocating within Albania.

An alien who arrives in, or is present in, the United States may apply for asylum. INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets

the INA's definition of a "refugee."  INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).[4]  A

"refugee" is defined as

> any person who is outside any country of such person's nationality or,
> in the case of a person having no nationality, is outside any country in
> which such person last habitually resided, and who is unable or
> unwilling to return to, and is unable or unwilling to avail himself or
> herself of the protection of, that country because of persecution or a
> well-founded fear of persecution on account of race, religion,
> nationality, membership in a particular social group, or political
> opinion . . ..

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A).  "The asylum applicant carries

the burden of proving statutory 'refugee' status."  D-Muhumed, 388 F.3d at 818.

To establish asylum eligibility, the petitioner must, with specific and

credible evidence, demonstrate (1) past persecution on account of a statutorily

listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause

future persecution.  8 C.F.R. § 208.13(a), (b); Al Najjar v. Ashcroft, 257 F.3d

1262, 1287 (11th Cir. 2001).  If the petitioner demonstrates past persecution, there

is a rebuttable presumption that he has a well-founded fear of future persecution.  8

C.F.R § 208.13(b)(1).  If he cannot show past persecution, then the petitioner must

demonstrate a well-founded fear of future persecution that is both subjectively

---

[4]  Pursuant to the REAL ID Act, INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), was amended
to add "The Secretary of Homeland Security or the Attorney General," as if enacted on March 1,
2003.  See Pub.L. 109-13, 119 Stat. 231 (May 11, 2005), Division B, Sec. 101, 8 U.S.C.
§ 1158(b)(1) and note (1).

genuine and objectively reasonable. Al Najjar, 257 F.3d at 1289. The subjective component can be proved "by the applicant's credible testimony that he or she genuinely fears persecution," while the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation omitted). The asylum applicant, however, must show that he faces a threat of future persecution country-wide. Arboleda v. U.S. Att'y General, 434 F.3d 1220, 1223 (11th Cir. 2006); see also see Mazariegos v. Office of U.S. Att'y Gen., 241 F.3d 1320, 1327 (11th Cir. 2001) (explaining that, under the "country-wide" requirement, "it is not unreasonable to require a refugee who has an internal resettlement alternative in his own country to . . . establish that such an option is unavailable").

An alien seeking withholding of removal under the INA similarly must show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." See INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). The burden of proof for withholding of removal, however, is "more likely than not," and, thus, is "more stringent" than the standard for asylum relief. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 (11th Cir. 2005).

18

Here, as the IJ noted, Mujaj conceded during the hearing on his application for relief from removal that he had family still in Albania who had not been harmed.  See Ruiz v. U.S. Att'y Gen., No. 05-13987, manuscript op. at 20 (11th Cir. Jan. 4, 2006) (concluding that alien's claim was contradicted by his testimony that his son and his parents had remained unharmed in the region of Colombia where the alien allegedly was threatened).  Moreover, the 2001 Country Report for Albania included that, although the DP credibly reported some incidents of police harassment of its members for political reasons, there were no confirmed cases of political killing or disappearances by the government or its agents, and the killings that occurred throughout the country usually were "the result of individual or clan vigilante actions connected to traditional 'blood feuds' or criminal gang conflicts." The 2003 Country Report similarly included that (1) there were no confirmed cases of political killings or disappearances by the government or its agents, (2) many killings that had occurred throughout the country were the result of traditional "blood feuds" or criminal gang conflicts, and (3) there were some improvements in its human rights record.  Additionally, the 2004 Profile included that, "[t]hough serious political repression existed in the past, there are no indications of systemic political persecution in Albania at the present time."

19

Thus, even if we were to conclude that a presumption of future persecution existed based on past persecution, the government rebutted this presumption by showing by a preponderance of the evidence that Albania's conditions have changed, such that Mujaj's life or freedom no longer would be threatened upon his removal. See 8 C.F.R. §§ 208.13(b), 208.16(b). Moreover, Mujaj failed to establish that his fear of future persecution in Albania was country-wide. See Arboleda, 434 F.3d at 1223. The IJ's and the BIA's determinations that Mujaj was not eligible for either asylum or withholding of removal, therefore, were supported by substantial evidence. See Adefemi, 386 F.3d at 1027; see also Mazariegos, 241 F.3d at 1324-25 n.2 (explaining that, "if an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of [removal]").

Finally, concerning Mujaj's challenge to the denial of his application for withholding of removal under the CAT, to be entitled to mandatory withholding of removal under the CAT, an applicant must establish that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). "Torture" is defined as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has

20

committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).

"Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 208.18(a)(2). We have concluded that the burden of proof for an applicant seeking withholding of removal under the CAT, like that for an applicant seeking withholding of removal under the INA, is higher than the burden imposed on an asylum applicant. Al Najjar, 257 F.3d at 1303-04. Thus, if a petitioner fails to demonstrate a "well-founded fear of persecution" sufficient to support an asylum claim, he or she likewise cannot demonstrate "torture" sufficient to warrant relief under the CAT. Id.

Because Mujaj failed to demonstrate a "well-founded fear of persecution," he could not meet the higher burden of demonstrating "torture" sufficient to warrant CAT relief. See id. Regardless, even if Mujaj had established that, upon his return to Albania, he will suffer "an extreme form of cruel and inhuman treatment" he did not allege torture by a "public official or other person acting in an official capacity." See 8 C.F.R. § 208.18(a)(1). Indeed, the 2004 Profile

21

included that, since 1998, neither the government nor the major political parties engaged in policies of abuse or coercion against their political opponents.

Accordingly, we conclude that the IJ's and the BIA's determinations that Mujaj was not eligible for either asylum or withholding of removal under the INA, or withholding of removal under the CAT, were supported by substantial evidence in the record. We, therefore, deny Mujaj's petition for review.

**PETITION DENIED.**