[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-13915
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 6, 2009
THOMAS K. KAHN
CLERK

Agency No. A95-265-503

ALIANE SAINT-CLAIR,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(April 6, 2009)

Before BLACK, BARKETT and FAY, Circuit Judges.

PER CURIAM:

Aliane Saint-Clair, a native and citizen of Haiti, petitions this Court for review of the Board of Immigration Appeals' ("BIA") order denying her application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). For the reasons set forth below, we deny her petition.

## I.

In January 2005, immigration authorities served Saint-Clair with a notice to appear ("NTA"), alleging that she entered the United States on August 8, 2001, without being admitted or paroled. As a result, the NTA alleged that she was removable, pursuant to Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i).

Saint-Clair then filed an application for asylum, withholding of removal, and CAT relief that she had prepared back in April 2002. In her application, Saint-Clair stated that she had worked as a cosmetologist in a beauty salon in Port Au Prince, Haiti, until the time she left the country in August 2001. She also noted that one of her parents remained in Port Au Prince. She explained that she was seeking political asylum in the United States because supporters of the Lavalas political party tried to kill her on account of her political opinion. She explained the primary incident giving rise to her application as follows:

2

> I am seeking political asylum in the United States because I am
> scare[d] for my life, May 30th 2001 Those men came by night 3am
> kidnaped me, interrogated me, on my political opinion and about . . .
> Convergence, my relation with U.S.A. I received all kind of bad
> treatment from them, they released me with pain continuously hard.

She stated that she suffered continuous pain and that she feared that she would be tortured and killed if returned to Haiti.

At an initial hearing before an immigration judge ("IJ"), Saint-Clair admitted the allegations in the NTA and conceded to the charge of removal. Saint-Clair then filed an amended application. In this application, she added that she was married to a Haitian man who lived in Canada. She also gave the following description of the May 30, 2001, incident:

> I am seeking Political Asylum because my life was in real danger in
> Haiti. . . . I used to speak with my clients in the Beauty Salon against
> the Government Lavalas and participated in demonstration as Anti-
> Lavalas. I have been reported by my own client since then, I received
> several phone calls threaten[ing] me because I am anti-Lavalas and
> th[at] I must be killed. On May 30, 2001 at 3:00 o'clock in the
> morning; a group of Chimeres [Lavalas supporters] came at my house,
> they broke the entrance door, they beat me severely, I was kidnaped
> and transported away from my house I was interrogated regarding my
> political opinion, I was badly injured but after 35 minutes I have been
> released then in order to save my life, I left Haiti to come here on
> August 8, 2001.

At the removal hearing, Saint-Clair testified on her own behalf as follows. She married a man in New York in January 2004, but she did not know his immigration status. In Haiti, she had worked as a hairdresser and beautician in a

3

Port Au Prince "studio" that had three other employees. She often used to express her political opinions to her clients in the studio and, because she expressed dissatisfaction with the governing Lavalas party, she was persecuted as a result.

Saint-Clair testified that she "started receiving calls at [her] home because [of] the way [she] was talking." She testified that she "didn't know that they could become something serious" at first and could not remember what month or year she received the calls. When asked how many calls she received, Saint-Clair testified that she "received a lot" but could not "remember exactly how many . . . ." Counsel then asked her to estimate whether she received more than 20 calls or more than 50 calls and, after the government objected that counsel was leading, Saint-Clair responded, "Yeah, I received more than 30 calls." She did not know whether it was the same person who called or whether there were different callers, she did not recognize the voices on the telephone, and she testified that they always said: "[Y]ou talking, you badmouthing the president, we're going to come and get you."

With respect to the May 30, 2001 incident, Saint-Clair's entire testimony was as follows:

> COUNSEL:     Now other than the phone calls, what else did you
>              mean by persecution?

4

SAINT-CLAIR:    When I say that for instance in May, on May 30th, 2001, they came to my home.  They entered my home and they came in at 3:00 in the morning.

. . .

COUNSEL:    Okay, when you say they, who do you mean?

SAINT-CLAIR:    Chimere Lavalas.

COUNSEL:    Okay, how many?

SAINT-CLAIR:    I don't know exactly but they [broke in] and they came in, they [broke in].  They broke in the door.

COUNSEL:    Okay, and . . . how did they break the door?

SAINT-CLAIR:    I don't know with what they did it, but they just came in, they broke in, they came in, they entered.

COUNSEL:    Now when you say they, I assume you mean more than one.  How many did you see?

SAINT-CLAIR:    No, they were, it was not just one, there were many.  I don't know how many, but they were more than one.  And when they broke in, they robbed me, they throw me on the floor, and they start beating me all over my body.

COUNSEL:    Okay, what did they look like?

SAINT-CLAIR:    They wore masks.

COUNSEL:    Masked with what?

SAINT-CLAIR:    You can, you could only see their eyes.

5

COUNSEL:        Okay, and what, what did the rest of them look like?  What did the rest of their body look like?  How were they clothed?

SAINT-CLAIR:    They were all wearing pants and shirts.

COUNSEL:        Okay, did they carry any weapons?

SAINT-CLAIR:    Yeah.

COUNSEL:        Okay, what kind of weapons did they carry?

SAINT-CLAIR:    I don't know anything about weapons.

COUNSEL:        Well, I'm not asking you for the specifics of them.

SAINT-CLAIR:    Different kind of weapons.  I don't know if you're talking about guns, if you're talking about machete[s].

COUNSEL:        Yes, did you see any of those or all of them?

SAINT-CLAIR:    Yeah.

COUNSEL:        All right.  Now you said that they threw you down and they did what?

SAINT-CLAIR:    And they start beating me when they throw me on the floor and they were saying that's the one who is badmouthing the president.

COUNSEL:        All right, how many of them beat you?

SAINT-CLAIR:    How many of them?

COUNSEL:        How many of them, how many chimeres beat you?

SAINT-CLAIR:    There were many.

6

Counsel then asked Saint-Clair how she knew that the men were Lavalas supporters, but before she was given the opportunity to answer the question, the IJ granted a five minute recess.

When the hearing reconvened, the IJ expressed concern over the fact that Saint-Clair did not know the immigration status of her husband. The IJ therefore questioned Saint-Clair about her marriage and, after learning that her husband might be a Canadian citizen, ultimately decided to continue the hearing so that the parties could explore that issue. The IJ clarified that he was not taking any action on the asylum application at that time. At a subsequent hearing, counsel for Saint-Clair informed the IJ that, regardless of however the Canadian issue was resolved, Saint-Clair wished to proceed on her asylum application.

At the next hearing, and after hearing legal argument from both parties, the IJ issued an oral decision denying Saint-Clair's application. After noting, <u>inter alia</u>, that "there [wa]s little disagreement between the application for asylum and the respondent's testimony," the IJ concluded that Saint-Clair did not "meet those standards of proof necessary in order to make a case in which this Court may make a grant of asylum or any of its lesser remedies . . . ." (<u>Id.</u> at 48). First, the IJ found that she did not establish a nexus between any political activity and her alleged past persecution. The IJ next found that Saint-Clair did not have a well-founded fear of persecution, as she did not report her alleged persecution to the authorities in Haiti

7

and, instead of attempting to relocate in Haiti, came directly to the United States. The IJ further found it evident that Saint-Clair did not demonstrate a countrywide fear of persecution, reiterated that she did not assert that she could not relocate to other cities in Haiti or even other neighborhoods in Port Au Prince, and highlighted that "at least one family member . . . remained in Port Au Prince." Returning to the previous issue of past persecution, the IJ found that he could not "conclude that past persecution is present in this case in any respect," as the anonymous telephone threats and "a single assault in [Saint-Clair's] home . . . by nameless men who the applicant could not identify with any particular group" did not rise to the level of persecution. Accordingly, the IJ denied Saint-Clair asylum, withholding of removal, and relief under CAT.

The BIA dismissed Saint-Clair's appeal. The BIA "agree[d] with the [IJ's] determination that respondent failed to establish a sufficient nexus between her attack in May 2001 and one of the protected grounds." Furthermore, the BIA also found that this "single incident" did not rise to the level of persecution, as Saint-Clair was "not seriously harmed and did not seek out any medical treatment for her injuries." In addition, the BIA found that Saint-Clair "has not demonstrated a well-founded fear that she will now be targeted throughout Haiti on account of a statutorily protected ground given the changed political climate in Haiti." Finally, with respect to her CAT claim, the BIA "affirm[ed]" the IJ's conclusion that

8

Saint-Clair had not shown that it was "more likely than not" that she would be tortured if returned to Haiti or that she would be harmed by, or with the acquiescence of, public officials.

## II.

When the BIA issues a decision, we review only that decision, except to the extent that the BIA expressly adopts the IJ's decision. Al Najjar v. Aschroft, 257 F.3d 1262, 1284 (11th Cir. 2001). "Insofar as the [BIA] adopts the IJ's reasoning, we will review the IJ's decision as well." Id. In this case, because the BIA drew its own conclusions on the issue of past persecution and whether Saint-Clair had a well-founded fear of persecution, we review only the BIA's decision on those issues.

To the extent that the BIA's decision was based on a legal determination, review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). Factual determinations, however, are reviewed under the "highly deferential substantial evidence test," which requires this Court to "view the record in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc). We "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1284 (quotation omitted). "We

9

may not reweigh the evidence and may not reverse the BIA's findings of fact unless the record compels a contrary conclusion." Arboleda v. U.S. Att'y Gen., 434 F.3d 1220, 1222 (11th Cir. 2006).

An alien who arrives in or is present in the United States may apply for asylum. INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A).

The asylum applicant carries the burden of proving statutory "refugee" status. 8 C.F.R. § 208.13(a); Al Najjar, 257 F.3d at 1284. "To establish asylum eligibility, the alien must, with specific and credible evidence, establish past persecution on account of a statutorily listed factor, or a 'well-founded fear' that the statutorily listed factor will cause such future persecution." Yang v. U.S. Att'y Gen., 418 F.3d 198, 1202 (11th Cir. 2005) (emphasis added); see 8 C.F.R.

10

§ 208.13(a)-(b). An applicant for asylum who has established past persecution on a protected ground is presumed to have a fear of future persecution on the basis of the original claim. 8 C.F.R. § 208.13(b)(1). "If [s]he cannot show past persecution, then the petitioner must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable." Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1257 (11th Cir. 2006).

## III.

Although the term is not defined by the INA, we have held that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (quotations omitted). "In determining whether an alien has suffered past persecution, the IJ must consider the cumulative effects of the incidents." Delgado v. U.S. Att'y Gen., 487 F.3d 855, 861 (11th Cir. 2007).

In this case, the record does not compel the conclusion that Saint-Clair suffered past persecution because her descriptions of the threatening telephone calls and the May 30, 2001, incident lack the requisite detail and specificity.[1] With respect to the telephone calls, the description in her amended application provided

---

[1] We take Saint-Clair's testimony as true for purposes of this appeal because the IJ did not expressly make an adverse credibility determination. Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1255 n.2 (11th Cir. 2007); Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005).

only that the callers threatened to kill her because she was speaking out against the Lavalas party. In her testimony, Saint-Clair could not remember the month or even the year that she received the calls or whether there were multiple callers. In addition, she testified that she initially did not realize that the calls could develop into something serious. Finally, Saint-Clair vaguely testified that she received "a lot" of calls, and it was only after her attorney asked her a leading question – whether she received more than 20 or more than 50 calls – that she testified that she received more than 30 calls.

With respect to the May 30, 2001, incident, Saint-Clair stated in her original application only that unknown men kidnaped and interrogated her, she "received all kind[s] of bad treatment from them," and "they released [her] with pain continuously hard." In her amended application, Saint-Clair provided that Lavalas supporters broke into her house, "beat [her] severely," kidnaped and interrogated her, and "badly injured" her. Saint-Clair's brief testimony about this incident was similarly lacking in detail. She was unable to estimate how many attackers there were, could not speculate on how they broke in to her house, did not offer any information on the duration of the beating or whether the men beat her with weapons or objects, did not elaborate on the alleged kidnaping and interrogation, and did not describe the extent of her injuries or whether she sought medical assistance. Although Saint-Clair testified that the men wore masks, when asked by

12

counsel what clothing the men were wearing, she simply responded that they wore "pants and shirts." And, although Saint-Clair ultimately testified that the men were armed with guns and machetes, she provided this testimony in response to leading questions by her attorney and after initially responding that she did not know anything about weapons. In sum, Saint-Clair's accounts of the threatening telephone calls and the May 30, 2001, incident are wholly lacking in the detail and specificity required to compel the conclusion that she suffered mistreatment rising to the level of persecution.[2]

Because Saint-Clair failed to establish that she suffered past persecution, it remained her burden to establish a well-founded fear of persecution if she were to return to Haiti. Ruiz, 440 F.3d at 1257. In her brief, Saint-Clair does not point to any evidence in the record on this point at all, let alone any evidence that would compel the conclusion that she had a well-founded fear of persecution.

Instead, she quotes at length from our decision in Arboleda and states in one sentence that "the Immigration Judge did not discuss whether relocation would be successful or reasonable" under the factors in 8 C.F.R. § 1208.13(b)(3). See Arboleda, 434 F.3d at 1226-27 (reversing the BIA's conclusion that the government had met its burden to show that the petitioners could reasonably

---

[2] Thus, we decline to address the IJ's and BIA's alternative finding that Saint-Clair failed to establish a nexus between the alleged past persecution and any imputed political opinion.

13

relocate because the BIA did not "mention any of the other factors it should have considered [under the regulation] in making this determination").

As an initial matter, Saint-Clair's argument fails because we are not reviewing the IJ's decision on this issue, since the BIA made its own, independent finding. In any event, this case is distinguishable from Arboleda because, unlike the petitioners in that case, Saint-Clair did not establish past persecution and, therefore, she had the burden to establish a well-founded fear of persecution. See Arboleda, 434 F.3d at 1224 ("In the instant case, as the government concedes, the BIA presumed past persecution and therefore the burden was on the government to show that internal relocation was reasonable."). Despite this burden, Saint-Clair does not even attempt to explain how consideration of the relocation factors would have demonstrated that she could not have reasonably relocated to Haiti. Thus, even if the agency failed to properly analyze the relocation factors, this error was harmless.

In sum, Saint-Clair has not demonstrated that the record compels the conclusion that she suffered past persecution or has a well-founded fear of persecution. Thus, because Saint-Clair has failed to meet her burden of proof with respect to her claim for asylum, she has necessarily also failed to meet her burden of proof with respect to her claims for withholding of removal and relief under

14

CAT. <u>Forgue v. U.S. Att'y Gen.</u>, 401 F.3d 1282, 1288 n.4 (11th Cir. 2005).

Accordingly, we deny the petition.

**PETITION DENIED.**